UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 08-CV-1194 (DWF/JJK)

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>*ex rel*. Ricia Johnson and Health )<br>Dimensions Rehabilitation, Inc., )<br>)<br>    Plaintiffs, )<br>)<br>)<br>)<br>           v. )<br>)<br>Golden Gate National Senior )<br>Care, L.L.C., and GGNSC Holdings, )<br>L.L.C., and GGNSC Wayzata, L.L.C., )<br>all doing business as Golden )<br>LivingCenter – Hillcrest of Wayzata, )<br>And Aegis Therapies, Inc. )<br>)<br>    Defendants. )| **THE UNITED STATES OF AMERICA'S STATEMENT OF INTEREST IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS RELATORS' COMPLAINT** |

The Government submits this Statement of Interest pursuant to 28 U.S.C. § 517 to clarify certain important legal issues raised by Golden Gate in its Motion to Dismiss Relators' Complaint.   The Government has a keen interest in the proper interpretation of the False Claims Act ("FCA"). The FCA is the Government's primary tool to combat fraud and recover public monies wrongfully paid in federal contracts and programs. An important element of the law is the provision allowing for relators to act "in their capacity as 'private attorneys general.'" *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1514 (8th Cir. 1994). The Government has a strong interest in the proper interpretation of the role of relators in cases where, as here, the Government has declined to intervene.

The Government addresses three issues herein. First, the Defendants' Motion to Dismiss Relators' Complaint (Dkt. No. 41) interprets too broadly the public disclosure bar that would preclude qui tam plaintiffs' claims under the FCA. In particular, the Defendants incorrectly argue that a series of publications regarding generalized improper billing practice across a large industry acts as a public disclosure for all future FCA claims raising any billing-related issue in that industry years later.  Second, Defendants take an unduly restrictive view of Federal Rule of Civil Procedure 9(b)'s application to FCA cases. Finally, Defendants suggest that the Court interpret the government's decision not to intervene as a commentary on the merits of the case. In fact, the Government takes no position on the merits of the case, and neither its declination decision nor this statement should be interpreted otherwise.

## I.      Public Disclosure Analysis

Relators' Complaint (Docket No 1) contains four counts, all under the FCA at 31 U.S.C. § 3729. Generally, Relators allege that Defendants' physical therapists billed federal payors for non-skilled exercise activities that were not properly supervised, and that Defendants billed federal payors for individual skilled therapy services even though the services provided were actually group exercises. (Complaint ¶¶ 13-17,  21.) Defendants ask this Court to find Relators' Complaint barred by the FCA's public disclosure provision because prior reports have made the government aware of "potential problems in billing for physical and occupational therapies in nursing homes since the early 1990s."  (Defendant's Brief in Support of Motion to Dismiss ("MTD"), Docket No. 41, at 10.)  Defendants rely on a series of bulletins issued more than a decade ago by the

Department of Health and Human Services Office of the Inspector General ("OIG") ,

along with a handful of court cases.  Defendants do not suggest that any of the OIG

bulletins or cases mention any of the Defendants.  Instead, they rely on cases suggesting

that in certain circumstances, the public disclosure bar can be triggered in the absence of

any mention of a particular defendant.   But none of the putative generic public

disclosures contains the essential elements of the particular transactions at issue in

Relators' Complaint in this case. In any event, a general disclosure of improper practices

across a large industry cannot possibly serve as a public disclosure of all future fraudulent

activity in that entire industry.

**A.     Public reports that do not contain the "essential elements" of fraudulent transactions do not trigger the public disclosure bar.**

The FCA prohibits any person from making false or fraudulent claims for payment

from the Government.  *See* 31 U.S.C. § 3729(a)(1)(A) – (G) (setting forth various types

of false or fraudulent activity predicating FCA liability).[1]  The FCA broadly encompasses

"all fraudulent attempts to cause the Government to pay out sums of money."  *United*

*States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968).  A qui tam plaintiff may continue

with an action under the False Claims Act after the Government has elected not to

intervene. 31 U.S.C. § 3730(c)(3). However:

---

[1]  Congress amended the FCA in March 2010, narrowing the scope of the public disclosure bar. However, the Supreme Court, in *Graham County Soil & Water Cons. Dist. v. U.S. ex rel. Wilson*, 559 U.S. ___, ___, 130 S.Ct. 1396, 1400 n. 1 (2010), noted that the amendment was not retroactive. Cases such as this one that were pending when the amendment was passed are analyzed under the previous statute. *Id*.

3

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
>> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>> (iii) from the news media,
>
> unless . . . the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). When determining whether applying § 3730(e)(4) bars a relator's action, the Eighth Circuit Court of Appeals applies a three-part test: "(1) Have allegations made by the relator been 'publicly disclosed' before the qui tam suit was brought? (2) If so, is the qui tam suit 'based upon' the public disclosure? and (3) If so, was the relator an 'original source' of the information on which the allegations were based?" *Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1042 (8th Cir. 2002). A negative answer to either of the first two questions, or an affirmative answer to the third question, allows a qui tam plaintiff to proceed. *Id.*

The public disclosure bar applies only "when the essential elements comprising [a] fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud." *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1514 (8th Cir. 1994). "Embracing too broad a definition of 'transaction' threatens to choke off the efforts of qui tam relators in their capacity as 'private attorneys general.'" *Id.* To bar an action, the information in the public domain should lead to a "clear or substantial [] indication of foul play." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 656 (D.C. Cir. 1994).

4

**B. Reports Alleging Generalized, Industry-wide Fraud Do Not Trigger the Public Disclosure Bar.**

Defendants' public disclosure argument relies in large part on OIG reports that identify fraud in a very large industry and do not name any of the Defendants, as well as lawsuits that do not name any of the Defendants.   Nevertheless, Defendants argue, "The government has been aware of potential problems in billing for physical and occupational therapies in nursing homes since the early 1990s." MTD at 10. That statement as written is true; concerns about billing practices led the Centers for Medicare and Medicaid Services to institute a prospective payment system (PPS) in 1998 in an attempt to cut down on the fraud.  But it does not follow that simply because the government knew generally about potential billing problems involving therapy in the 1990's and tried to fix them, that it foresaw the specific conduct at issue in this case at a particular nursing home in Minnesota more than a decade later.   As of 2004 there were approximately 16,000 nursing homes in the United States, and approximately 1.5 million residents at those nursing homes. *See* http://www.cdc.gov/nchs/fastats/nursingh.htm.   A 1998 report cited by Defendants indicated that more than 80 million physical and occupational therapy sessions were provided to SNF patients in the 12 months ending in June 1998. (Docket No. 42-5, Exhibit E to Heffelfinger Affidavit, at Appendix B.)    Among those tens of millions of annual therapy sessions at the  thousands of nursing homes in the United States, the government certainly did not have specific knowledge as to every therapy session that may have been billed improperly or fraudulently—that is, with the scienter

required by the FCA.[2]  Accordingly, the OIG bulletins cited by Defendants cannot possibly be read to bar all relators from even filing an FCA case alleging specific billing misconduct by specific nursing homes.  Accounts of generalized improper billing practices in a large industry, and prophylactic measures to prevent such practices in the future, do not disclose the "essential elements comprising [a] fraudulent transaction." *Cf Rabushka*, 40 F.3d at 1514.   The identity of a fraud's perpetrator, the perpetrator's knowledge and the method used to carry out the fraud are among the most fundamental elements of an allegation under the False Claims Act.   The OIG bulletins cited by Defendants on their face do not contain all these elements regarding Defendants' conduct, nor could they conceivably do so, given that the conduct alleged here post-date the reports by half a decade or more.

The public disclosure bar embodies Congress's attempt to achieve "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own."   *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994).  Courts have accordingly analyzed the provision to reconcile the "twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *Id.* at 651.

---

[2] The knowledge standard set forth in 31 U.S.C. § 3729(b) requires actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity.

Defendants' argument would upset this careful balance by barring *qui tam* suits even in cases where the government has no viable alternative means to obtain the information provided by relators. Defendants argue that a report issued many years before the transactions cited in a relator's complaint even occurred, describing general problems in a large industry, is sufficient to bar all claims against any member of that industry for all time.   That argument is obviously wrong and if accepted, would undermine Congress' purpose in enacting the qui tam provisions of the FCA.  The United States cannot be said to possess sufficient information to "discover" a defendant's future fraud.  Certainly, a relators' suit cannot be said to be "based upon" such disclosures where, as here, the relators' allegations concern particular acts that had not even transpired at the time the report was issued.  Defendants' argument is not only meritless, but illogical.

The relevant decisions in courts of appeals support the conclusion that generalized reports of misconduct in a large industry do not constitute a public disclosure.  The Eleventh Circuit has recognized that while "[t]he government often knows on a general level that fraud is taking place and that it, and the taxpayers, are losing money," the dominant issue for public disclosure purposes is whether the government will have "difficulty identifying all of the individual actors engaged in fraudulent activity." *Cooper* v. *Blue Cross & Blue Shield*, 19 F.3d 562, 566 (11th Cir. 1994) (per curiam).  To avoid "hamper[ing] the discovery of specific instances of fraud and the recovery of losses" by the government, and potentially insulating an entire industry from qui tam suits based solely on generic reports of industry corruption, the Eleventh Circuit has held that GAO

7

findings and Inspector General reports of widespread fraud among Medicare health plan administrators are insufficient to trigger the public disclosure bar, absent identification of a specific defendant. *Id.* at 566, 566 n.7. *See also United States ex rel. Foundation Aiding the Elderly* v. *Horizon West*, 265 F.3d 1011, 1016 n.5 (9th Cir. 2001).

Other courts of appeals have applied a similar analysis. The D.C. Circuit has held that the public disclosure bar does not apply where the government must "comb[] through the myriad of transactions performed by the various [industry defendants] in search of fraud," but only where the disclosure sets forth "easily identifiable defendants" engaged in clear methods of fraudulent activity. *United States ex rel. Findley* v. *FPC-Boron Employees' Club*, 105 F.3d 675, 687 (D.C. Cir. 1997). The court in *Findley* accordingly held that the public disclosure bar prohibits suit where public reports "specifically identify the nature of the fraud . . . as well as the [actors] engaged in the allegedly fraudulent activity," as opposed to general, industry-wide allegations of the sort at issue in *Cooper. Id.*

The Ninth and Tenth Circuits have adopted like reasoning. *See United States* v. *Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1019 (9th Cir. 1999) (bar applies where "disclosures contained enough information to enable the government to pursue an investigation against" a particular defendant, by naming "a narrow class of suspected wrongdoers" that it was "highly likely that the government could easily identify"); *United States ex rel. Fine* v. *Sandia Corp.*, 70 F.3d 568, 572 (10th Cir. 1995) ("When attempting to identify individual actors, little similarity exists between combing through the private

insurance industry in search of fraud [as in *Cooper*] and examining the operating procedures of nine, easily identifiable, DOE controlled, and government-owned laboratories."). As these decisions highlight, a public disclosure must contain "identified techniques" and implicate responsible individuals: "general allegation[s] of Medicare fraud" and similar widespread practices, which "do[] not help the government know where to focus in an investigation of the countless individual Medicare claims submitted to the government by vast numbers of health care providers and individuals," do not suffice. *In re Natural Gas Royalties*, 562 F.3d 1032, 1042-43 (10th Cir. 2009).

Most recently, the Seventh Circuit acknowledged this precedent, observing: "As far as we can tell, no court of appeals supports the view that a report documenting widespread false claims, but not attributing them to anyone in particular, blocks *qui tam* litigation against every member of the entire industry." *United States ex rel. Baltazar v. Warden,* 637 F.3d 866, 868 (7th Cir. 2011). In so doing, the Court distinguished its decision in *United States ex rel. Gear* v. *Emergency Medical Associates*, 436 F.3d 726 (7th Cir. 2006), explaining that its decision in the earlier case was predicated on the uniformity of the practices alleged and the paucity of information contributed by the relator:

> Defendants rely heavily on *Gear*, but to say that a report identifying a *uniform* practice activates § 3730(a)(4)(A) does not imply anything about the effect of a report disclosing that some but not all firms use a practice. Once the GAO concluded that teaching hospitals routinely disregarded the required distinction between work in the teaching program and work as an attending physician, the only extra fact required was that the defendant is a medical school or teaching hospital. That's public knowledge.

9

> Gear's suit did not add one jot to the agency's fund of
> information; the panel rightly called it ''parasitic.''

*Baltazar*, 637 F.3d at 869.  In contrast, the Seventh Circuit explained, "A statement such as "half of all chiropractors' claims are bogus" does not reveal *which half* and therefore does not permit suit against any particular medical provider." *Id.* The court suggested that a relator who identified which of those claims were bogus would be entitled to pursue an FCA claim. *Id.*

In this case, the public reports at issue in this case concern thousands of potential defendants, tens of millions of Medicare claims, and a variety of generic techniques for perpetrating fraud.  Intimations of improper conduct in an industry of that size do not implicate every market participant as a potential defendant for purposes of the public disclosure bar.  The United States cannot reasonably be expected to inquire into the past conduct, much less the future conduct, of every participant in a large industry every time an OIG report comes out. [3]

## C. Cases Against Other Defendants Also Do Not Invoke the Public Disclosure Bar.

For similar reasons, the previous court cases that Defendants assert are public disclosures also do not publicly disclose the allegations in this case.  See MTD at 10-11. Defendants do not assert that any of the cases were brought against the Defendants, and

---

[3] It is worth noting that in the same brief in which Defendants argue that generalized allegations of diffuse misconduct from over a decade ago should have "set the government on the trail of the alleged fraud" focused on a particular nursing home in Minnesota, they also contradictorily contend that the allegations in the Complaint are also made "without any specificity or precision." MTD at 1, 9. It is difficult to see how both of these could be true.

do not explain how the cases would have put the Government on notice of the allegations against the Defendants in this case. The notion that, for example, a lawsuit against Fairview Health System that was dismissed on the merits in 2004 should have put the government on notice of different allegations against those defendants that were not implicated in that case is illogical. It is not reasonable to expect the government to suspect wrongdoing by every company in an industry each time one market participant is accused of wrongdoing.

## II.     Defendants Improperly Construe Rule 9(b).

Defendants contend that Relators' Complaint fails to meet the requirements of Federal Rule of Civil Procedure 9(b) because Relators "have not sufficiently alleged that specific Defendants ever presented specific claims to the government," nor "alleged facts to show that any false claims were presented knowingly." Defendants rely upon an incorrect and overly exacting standard of compliance with Rule 9(b). The appropriate question at the dismissal stage – under general pleading standards and under Federal Rule of Civil Procedure 9(b) – is whether the allegations in the complaint, taken as a whole, make it plausible that a false claim for payment was submitted to the government or that a false statement was used to get a false or fraudulent claim paid by the government or to avoid an obligation owed to the government.

Under Rule 9(b), the complaint, as a whole, must identify the specifics of a fraudulent scheme and provide an adequate basis for an inference that false claims were submitted to the United States. *See Ebeid ex rel. United States* v. *Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010) (discussing Rule 9(b)); *United States ex rel. Duxbury* v. *Ortho*

*Biotech Products, L.P.,* 579 F.3d 13, 29-32 (1st Cir. 2009) (same). As the Ninth Circuit has explained, using representative examples of false claims submitted to the government is "simply one means of meeting the pleading obligation," but a particular false claim need not always be identified at the pleading stage because "it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Ebeid*, 616 F.3d at 998-99 (quoting *United States ex rel. Grubbs* v. *Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). *See also United States ex rel. Lusby* v. *Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009) (discussing Rule 9(b), explaining that a request for payment can be inferred at the pleading stage based on sufficient factual allegations).

In the cases discussed above, the First, Fifth, Seventh and Ninth Circuits all rejected a "specific claim" requirement in favor of a requirement that the complaint as a whole identify the specifics of a fraudulent scheme and provide an adequate basis for an inference that false claims were submitted to the United States.  Each of these decisions was issued in the past two years.

Defendants correctly point out that the Eighth Circuit's opinion in *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir.), cert. denied, 549 U.S. 881 (2006), suggests that relators are required to plead "some representative examples" of fraudulent conduct. The Court in *Joshi* did not require the relator to plead all the specifics of the actual false claims submitted, but affirmed the dismissal pursuant to Rule 9(b) in part because of the relator's failure to identify "a single, specific instance of fraud, much less any representative examples." *Id.* Earlier this year, the Eighth Circuit clarified

the applicable standard.  In *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d. 791 (8th Cir. 2011), the Court suggested that a Complaint need only "allege facts creating plausible inferences that [Defendant's] allegedly false claims" were presented to the government.  *Id.* at 798.  This "plausible inference" construction is more consistent with the prevailing formulation utilized by the First, Fifth, Seventh and Ninth Circuits in the cases discussed above, and should be applied here as well.

### III.   The Government's Decision Not To Intervene Does Not Give Rise To Any Inference On The Merits Of This Case.

Defendants suggest that the Court should draw an inference from the government's decision not to intervene in this matter. MTD at 21 ("The government's decision not to intervene is further evidence of Plaintiffs' failure to provide direct evidence of fraudulent activity.")  The government respectfully underscores for the Court that no inference should be drawn from that decision in the Court's assessment of the merits of Relators' claims. Because the government could have based its decision not to intervene on many factors, including those unrelated to the merits of the claim, the government respectfully submits that evidence of the government's declination is not probative of any matter concerning the merits of Relators' claims.

In deciding to decline to intervene against a *qui tam* defendant, the government "may have a host of reasons for not pursuing a claim." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n. 17 (11th Cir. 2006). This is why courts "do not assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrong doing insufficient or the *qui tam*

relator's allegations [of] fraud to be without merit." *Id. See also United States ex rel. DeCarlo v. Kiewit/AFC Enters.*, 937 F. Supp. 1039, 1047 (S.D.N.Y. 1996) (noting government's "[n]on-intervention does not necessarily signal governmental disinterest in an action"). Indeed, assuming the government looked unfavorably upon each *qui tam* action in which it elects not to intervene is inconsistent with the statutory provision permitting the government to intervene even after a decision to decline. *See* 31 U.S.C. § 3730(c)(3) (government may intervene even after declination upon a showing of good cause). Similarly, such an assumption is contrary to the purpose of the *qui tam* provision, *i.e.*, encouraging private parties to litigate on behalf of the government. *See United States ex rel. Berge v. Bd. of Trustees*, 104 F.3d 1453, 1458 (4th Cir. 1997), *cert. denied*, 522 U.S. 916 (1997) ("[T]he plain language of the Act clearly anticipates that even after the Attorney General has 'diligently' investigated a violation [of the FCA], the Government will not necessarily pursue all meritorious claims; otherwise there is little purpose to the *qui tam* provision permitting private attorneys general."). By the same token, where the government does not move to dismiss following a decision to decline intervention, *see* § 3730(c)(2)(A), courts should not presume that it has concluded that the relators' allegations were meritorious. Accordingly, no inference at all should be drawn from the government's decision not to intervene in this instance.

## CONCLUSION

For all of the above reasons, the government urges this court to interpret the public disclosure bar and Rule 9(b) in a manner consistent with the government's positions asserted herein, and to and make no inference from the government's decision not to intervene in this matter.

Date:  November 23, 2011

Respectfully submitted,

B. TODD JONES
United States Attorney

s/ Chad Blumenfield

BY:  CHAD A. BLUMENFIELD
Assistant U.S. Attorney
Attorney I.D. No. 387296
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600