# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America, ex rel. Ricia
Johnson and Health Dimensions
Rehabilitation, Inc.,

                    Plaintiffs,

v.

Golden Gate National Senior Care, L.L.C.;
GGNSC Holdings, L.L.C; and GGNSC
Wayzata, L.L.C.; all doing business as
Golden LivingCenter – Hillcrest of
Wayzata; and Aegis Therapies, Inc.,

                    Defendants.

Civil No. 08-1194 (DWF/HB)


**MEMORANDUM
OPINION AND ORDER**

---

Jonathan M. Bye, Esq., and Kelly G. Laudon, Esq., Lindquist & Vennum LLP, counsel
for Plaintiffs Ricia Johnson and Health Dimensions Rehabilitation, Inc.

Amy Slusser Conners, Esq., and Thomas Backer Heffelfinger, Esq., Best & Flanagan
LLP; Annisah Um'rani, Esq., and Robert Salcido, Esq., Akin Gump Strauss Hauer &
Feld LLP; and Kevin D. Hofman, Esq., and Ryan J. Burt, Esq., Peterson Habicht, PA;
counsel for Defendants.

Chad A. Blumenfield, D. Gerald Wilhelm, and Pamela Marentette, Assistant United
States Attorneys, United States Attorney's Office, counsel for United States of America.

---

## INTRODUCTION

Relators Ricia Johnson and Health Dimensions Rehabilitation, Inc. ("HDR")

(together, "Relators") initiated this *qui tam* action, on behalf of the United States of

America (the "Government"), against Defendants Golden Gate National Senior Care,

L.L.C.; GGNSC Holdings, L.L.C; and GGNSC Wayzata, L.L.C. (together, "Golden");

and Defendant Aegis Therapies, Inc. ("Aegis") (all together, "Defendants").  Relators

allege that Defendants violated the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"),

by submitting false Medicare claims in connection with Defendants' provision of

physical and occupational therapy services to nursing home patients.

The matter is currently before the Court on:  (1) Defendants' motion for summary

judgment (Doc. Nos. 237, 257); (2) Defendants' motion to exclude the expert testimony

of Elisa Bovee and Mark Essling (Doc. No. 260); (3) Relators' motion to exclude the

expert testimony of Steven Pelovitz (Doc. No. 239); and (4) Relators' motion to exclude

the expert testimony of Sheila Lambowitz (Doc. No. 242).  For the reasons discussed

below, the Court grants in part and denies in part the motion for summary judgment, the

motion to exclude the testimony of Bovee and Essling, and the motion to exclude the

testimony of Pelovitz.  The Court denies the motion to exclude Lambowitz's testimony.

## BACKGROUND

### I.    General Factual Background

From October 2004 through approximately May 2007, Relator Johnson, an

occupational therapy assistant, was employed by Defendant Aegis, a contract provider of

physical and occupational therapy services to nursing homes.  (Doc. No. 284 ("Johnson

Decl.") ¶ 2; Doc. No. 250 ("Um'rani Decl."), ¶ 45, Ex. 45 ("Ribar Dep.") at 9:19-10:6.)

During that time, Johnson worked at Golden LivingCenter – Hillcrest of Wayzata

("Hillcrest"), a nursing home operated by Defendant Golden, which operates multiple

nursing homes across the country.  (Johnson Decl. ¶ 2; Ribar Dep. 10:21-23; Doc. No. 285 ("Essling Decl.") ¶ 17, Ex. 4.)  After Johnson left Aegis, she was employed by Relator HDR, also a provider of physical and occupational therapy.  (Essling Decl. ¶¶ 3-4, 15; Um'rani Decl. ¶ 3, Ex. 3 ("Johnson Dep.") at 48:1-6, 143:3-6.)

From December 2005 through March 2007, Aegis assigned Johnson to Hillcrest's Wellness Center.  (Johnson Decl. ¶ 2.)  The Wellness Center, also known as the Nautilus Room, was a small exercise room with one or two stationary bicycles and five pieces of Nautilus strength-training equipment.  (*Id.*; Johnson Dep. 48:7-49:8.)  Typically, one occupational therapy assistant and one physical therapy assistant staffed the Wellness Center, although sometimes only one therapy assistant was present.  (Johnson Dep. 82:23-87:11, 92:3-8; Um'rani Decl. ¶ 6, Ex. 6 ("Hodgin Dep.") at 59:4-61:1; *id.* ¶ 9, Ex. 9 ("Weiche Dep.") at 27:8-14.)  Often, each therapy assistant simultaneously supervised multiple patients who were completing a circuit of two or four exercises. (Johnson Dep. 83:2-84:25; Hodgin Dep. 47:19-48:9.)  When two therapy assistants were working in the Wellness Center, they often worked as a team, with either therapy assistant guiding an individual patient at any given time.  (Johnson Dep. 83:2-84:25; Hodgin Dep. 52:6-19.)

Staff in the Wellness Center used single-page forms, called Nautilus Logs or flow sheets, to record patients' activities in the Wellness Center.  (Weiche Dep. 40:14-42:6; Hodgin Dep. 32:24-35:21.)  Each Nautilus Log contained short blanks for the patient's name, the name of the therapist initiating the program of therapy, and a brief diagnosis.

3

(Doc. No. 283 ("Laudon Decl.") ¶ 8, Ex. 3.)  In addition, each Nautilus Log included a space for staff to circle the applicable discipline or disciplines:  occupational therapy, physical therapy, or speech-language pathology.  (*Id.*)  And, each Nautilus Log contained a chart where staff could indicate the date a patient received therapy, the therapy assistant who provided the therapy, and the equipment, resistance level, and repetitions used.  (*Id.*)  The Nautilus Logs were stored in the Wellness Center; they were not maintained as part of patients' medical records.  (Hodgin Dep. 35:22-36:24; Johnson Decl. ¶ 3)  In fact, while medical records included Plans of Care for occupational therapy and physical therapy, they typically did not contain any express reference to the Wellness Center or to the Nautilus equipment located in the Wellness Center.  (Essling Decl. ¶¶ 20-22, Ex. 6.)

In addition to the Wellness Center, Hillcrest's facilities included an occupational therapy gym and a physical therapy gym.  (Weiche Dep. 29:11-23.)  All therapists and therapy assistants at Hillcrest, those who staffed the gyms and those who staffed the Wellness Center, attended weekly meetings during which patients were discussed.  (Johnson Dep. 37:9-38:21; Hodgin Dep. 80:4-83:25.)  For Medicare billing purposes, all therapists and therapy assistants used a computerized billing system to record the minutes of therapy that they provided each day.  (Weiche Dep. 38:7-40:8.)  Each therapist and therapy assistant logged into the computer system using a unique username and password.  (*Id.*)  The computerized billing system did not permit occupational therapists and occupational therapy assistants to record minutes of physical therapy, and it did not

permit physical therapists and physical therapy assistants to record minutes of occupational therapy.  (Um'rani Decl. ¶ 10, Ex. 10 ("Gobel Dep.") at 80:24-82:22.)

## II.   General Regulatory Background

Medicare is a federal health insurance program administered by the Centers for Medicare & Medicaid Services ("CMS"), a division of the U.S. Department of Health and Human Services ("HHS").  This case involves two parts of Medicare:  Part A and Part B, which provides supplemental insurance coverage for certain services excluded from Part A.  *See* 42 U.S.C. §§ 1395c through 1395i-5 (Part A); *id.* §§ 1395j through 1395w-6 (Part B).  The parties agree that Part A and Part B cover nursing home stays only when the nursing home provides "skilled services" such as occupational and physical therapy.  *See* 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. §§ 409.31, 410.59, 410.60.

A nursing home licensed to provide skilled services, such as Hillcrest, is a "skilled nursing facility" or "SNF."  *See* 42 U.S.C. § 1395i-3.  During the time period at issue, 42 C.F.R. § 483.75(b) required SNFs to "operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility."  42 C.F.R. § 483.75(b) (effective to Sept. 30, 2009),[1] *see also* 42 U.S.C.

---

[1]     Section 483.75 has been re-designated as § 483.70.  *See* Medicare & Medicaid Programs; Reform of Requirements for Long-Term Care Facilities, 81 Fed. Reg. 68,688, 68,861 (Oct. 4, 2016) (final rule codified at 42 C.F.R. pts. 405, 431, 447, 482, 483, 485, 488, & 489).  No party claims that this re-designation, or any other amendment of this regulation, affects the outcome of this case at this stage.

(footnote continued on next page)

§ 1395i-3(d)(4)(A).  Further, during the time period at issue, 42 C.F.R. § 483.75(*l*)(1)

required SNFs to maintain adequate medical records:  "The facility must maintain clinical

records on each resident in accordance with accepted professional standards and practices

that are—(i) Complete; (ii) Accurately documented; (iii) Readily accessible; and

(iv) Systematically organized."  42 C.F.R. § 483.75(*l*)(1) (effective to Sept. 30, 2009).[2]

Part A and Part B use different billing and payment systems.  Part A uses a

Prospective Payment System ("PPS"), under which CMS determines a *per diem*

reimbursement amount for each patient by considering a number of factors, including the

number of minutes of skilled services needed by the patient.  (*See* Doc. No. 287 ("Bovee

Decl.") ¶ 3, Ex. A ("Bovee Rep.") at 10-11.)  For each patient, SNFs submit an

assessment called the "Minimum Data Set" or "MDS" that, among other things, requires

SNFs to describe the medical condition and service needs of the patient, including the

days and minutes of occupational and physical therapy administered to the patient.  (*See*

*id.* at 11-17.)  Part B, in contrast to Part A, reimburses SNFs based on a fee schedule tied

to the minutes of service provided to a patient.  (*See id.* at 9-10.)

---

[2]      As noted above, § 483.75 has been re-designated as § 483.70.  *See* Medicare &
Medicaid Programs; Reform of Requirements for Long-Term Care Facilities, 81 Fed.
Reg. at 68,861.  In connection with this re-designation, § 483.75(*l*)'s provisions regarding
medical records are now found in § 483.75(i), and they have been slightly reworded.
*Compare* 42 C.F.R. § 483.75(*l*) (effective to Sept. 30, 2009) *with* 42 C.F.R. § 483.75(i)
(effective Nov. 28, 2016).  No party claims that the re-designation and rewording, or any
other amendment to this regulation, affects the outcome of this case at this stage.

Finally, under both Part A and Part B, two types of auditing occur:  (1) Claims

Review; and (2) Survey and Certification.  In Claims Review, CMS contractors review,

process, and pay claims submitted by SNFs to CMS.  (*See id.* at 17-19.)  In Survey and

Certification, state survey teams conduct on-site surveys of SNFs to ensure they are

complying with applicable Medicare standards.  (*See* Um'rani Decl. ¶ 38, Ex. 38

("Pelovitz Rep.") ¶¶ 3-20.)  Survey and Certification is separate and distinct from Claims

Review.  (*See* Doc. No. 245 at ¶ 5, Ex. B ("Pelovitz Dep.") at 20:8-25:11.)

## III.    Procedural Posture

On May 1, 2008, Relators filed their Complaint in this action.  (Doc. No. 1.)  On

June 27, 2011, the Government declined to intervene (Doc. No. 31), and on June 28,

2011, the Court ordered the Complaint unsealed and served on Defendants (Doc. No. 32).

On February 13, 2012, the Court denied Defendants' motion to dismiss the Complaint.

(Doc. No. 54).  On February 23, 2012, the Court ordered two-stage discovery.  (Doc.

Nos. 61, 62.)  In the first stage, discovery was limited to Hillcrest (as opposed to other

nursing homes operated or served by Defendants) and the period when Relator Johnson

worked in Hillcrest's Wellness Center, December 2005 through March 2007.  (Doc.

Nos. 62, 115.)  Under the Court's order, the second phase would occur only if the case

did not terminate, as a result of dispositive motion practice, after completion of the first

phase.  (*Id.*)  Thus, to date, only the first stage of discovery has taken place.

On May 8, 2014, after the Government again declined to intervene, Relators filed

an Amended Complaint.  (Doc. No. 178 ("Am. Compl.").)  On March 10, 2015, the Court

denied Defendants' motion to dismiss the Amended Complaint.  (Doc. No. 199).  The

Amended Complaint asserts four causes of action under the FCA.[3]  In Count I, Relators

allege that Defendants presented false claims for payment to the Government in violation

of 31 U.S.C. § 3729(a)(1)(A).  (Am. Compl. ¶¶ 33-35.)  In Count II, Relators allege that

Defendants made or used false records in violation of 31 U.S.C. § 3729(a)(1)(B).  (*Id.*

¶¶ 36-38.)  In Count III, Relators allege that Defendants conspired to defraud the

Government in violation of 31 U.S.C. § 3729(a)(1)(C).  (*Id.* ¶¶ 39-41.)  In Count IV,

Relators allege that Defendants made or used false records to avoid or decrease a

monetary obligation to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).  (*Id.*

¶¶ 42-44.)

     With respect to all four counts, the Amended Complaint's primary contention is

that Defendants violated the FCA by submitting Medicare claims while failing to comply

with various Medicare requirements.  (*See generally id.*)  Specifically, Relators allege

that Defendants certified compliance with various statutory and regulatory conditions

when they submitted their claims.  (*See id.* ¶ 4.)  However, according to Relators,

Defendants in fact failed to comply with all of these conditions, and therefore their

Medicare claims were false or fraudulent.  (*See id.* ¶¶ 3, 15, 17, 22-30.)  Relators assert

---

[3]    Relators' Amended Complaint cites a prior version of the FCA, but no party
claims that any change to the text of the FCA affects the outcome of this case at this
stage.

multiple theories of liability, involving a variety of statutes and regulations.  (*See generally id.*)

## DISCUSSION

## I.     The False Claims Act

Under the FCA's *qui tam* provisions, relators—private citizens acting as whistleblowers—may sue on behalf of the Government to recover damages for submission to the Government of materially false claims for payment.  31 U.S.C. §§ 3729, 3730; *see, e.g.*, *United States ex rel. Donegan v. Anesthesia Assocs. of Kans. City, PC*, 833 F.3d 874, 876 (8th Cir. 2016).  "The FCA attaches liability, not to the underlying fraudulent activity, but to the claim for payment." *United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 414 (8th Cir. 2012) (quoting *United States ex rel. Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998)).  As such, a viable FCA claim generally requires a relator to establish that the defendant presented a claim for payment to the Government, that the claim was *false* or fraudulent, and that the defendant *knew* the claim was false or fraudulent.  *United States ex rel. Simpson v. Bayer Healthcare (In re Baycol Prods. Litig.)*, 732 F.3d 869, 875 (8th Cir. 2013).  In addition, an FCA violation requires proof that a false or fraudulent claim or statement was *material* to the Government's decision to pay a claim.  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016); *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 797 (8th Cir. 2011).

Before turning to the motions filed by the parties, the Court briefly addresses the

FCA's knowledge and materiality requirements, which the parties dispute.

## A.    Knowledge

Under the FCA, a defendant must *knowingly* present a materially false claim.  *In*

*re Baycol*, 732 F.3d at 875.  The FCA defines "knowing" as having "actual knowledge"

or acting "in deliberate ignorance of" or "reckless disregard of the truth or falsity of the

information."  31 U.S.C. § 3729(b)(1)(A).  It does not require "proof of specific intent to

defraud."  *Id.* § 3729(b)(1)(B).

As in this case, an FCA claim may arise when a defendant certifies compliance

with statutory, regulatory, or contractual requirements but allegedly does not comply with

such requirements.  *See, e.g.*, *Escobar*, 136 S. Ct. at 1995-96; *Donegan*, 833 F.3d at

876-77; *United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 827 (8th

Cir. 2013).  While the parties dispute the contours of the knowledge requirement in these

circumstances, the Eighth Circuit has recently clarified the applicable standard.

*Donegan*, 833 F.3d at 878-79.  Namely, a defendant does *not* knowingly present a false

claim when:  (1) the requirement at issue is "ambiguous"; (2) the defendant acted

pursuant to an "objectively reasonable" interpretation of the requirement; and (3) no

formal government guidance warned the defendant away from its interpretation of the

requirement.  *Id.*; *see also United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281,

287-91 (D.C. Cir. 2015) (applying the interpretation of "reckless disregard" established in

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 (2007)); *Ketroser*, 729 F.3d at 832

("[Defendant's] reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud under the FCA.").  In short, if a regulation is ambiguous, a defendant may escape liability if its interpretation of the regulation was reasonable in light of available official guidance—even if the interpretation was "opportunistic."  *See United States ex rel. Donegan v. Anesthesia Assocs. of Kans. City, PC*, Civ. No. 12-876, 2015 WL 3616640, at *9 (W.D. Mo. June 9, 2015), *aff'd*, 833 F.3d 874 (8th Cir. 2016).

### B.    Materiality

In addition to the knowledge requirement, the FCA imposes a materiality requirement:  "[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be *material* to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct. at 2002 (emphasis added).  The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

Recently, the Supreme Court clarified that FCA liability is not limited to violations of statutory, regulatory, or contractual requirements that the Government labels as "conditions of payment," as opposed to "conditions of participation." *Escobar*, 136 S. Ct. at 2001-04.  In the words of the Supreme Court, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive" of the materiality inquiry. *Id.* at 2003.  In addition to the Government's identification of a provision, courts should consider, without limitation, the

Government's practice in paying or rejecting claims involving the statutory, regulatory, or contractual violation at issue. *Id.* at 2003-04; *see also Onnen*, 688 F.3d at 414-15 (explaining that "whether a specific type of regulatory non-compliance resulted in a materially false claim for a specific government payment" is a "fact-intensive" and "often complex" question); *United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 962 (rejecting distinction between conditions of payment and conditions of participation as dispositive of materiality inquiry).

The Supreme Court also noted that a defendant's knowledge that the Government would be *entitled* to refuse payment if the Government were aware of a violation is, without more, insufficient to meet the materiality requirement. *Escobar*, 136 S. Ct. at 2004. As the Supreme Court recognized, the materiality standard is "demanding," and the FCA is not "a vehicle for punishing garden-variety . . . regulatory violations." *Id.* at 2003.

## II.   Defendants' Motion for Summary Judgment

Having determined the applicable legal standards for claims under the FCA, the Court considers Defendants' motion for summary judgment as to all claims asserted by Relators. Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure

is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

The Court will apply the summary judgment standard to Relators' eight theories of liability, which the Court characterizes as follows:  (1) scope of license; (2) supervision; (3) documentation; (4) group therapy; (5) skilled services; (6) no therapy; (7) timekeeping; and (8) certification.  For each theory, Relators have the burden of establishing that Defendants' submitted a claim that was *false*, that Defendants submitted the false claim *knowingly*, and that the falsity was *material*.

## A.    Scope-of-License Theory

First, Relators claim that Defendants violated the FCA by submitting Medicare claims for services provided by therapy assistants acting outside the scope of their licenses.  (Am. Compl. ¶¶ 3, 12, 13, 15, 16, 18, 20, 30.)  Medicare regulations provide that CMS pays for occupational therapy services provided by occupational therapy

13

assistants and physical therapy services provided by physical therapy assistants; it does

not pay for services provided by those not authorized to provide them.  42 C.F.R.

§§ 409.23(b), 410.59(a), 410.60(a); Ctrs. for Medicare & Medicaid Servs., Medicare

Benefit Policy Manual, CMS Pub. No. 100-02, Ch. 15, §§ 220.1.2.B; 220.2.A (Rev. 228)

("Medicare Benefit Policy Manual").

Relators submit evidence that Defendants, in their Medicare claims, falsely

represented that all physical therapy services in the Wellness Center were provided by

physical therapy assistants and all occupational therapy services in the Wellness Center

were provided by occupational therapy assistants.  Specifically, Johnson testified that

therapy assistants in the Wellness Center provided both occupational and physical

therapy, regardless of licensure, and then allocated the minutes such that occupational

therapy assistants entered minutes of occupational therapy only and physical therapy

assistants entered minutes of physical therapy only.  (Johnson Dep. 82:23-87:11,

102:11-24, 174:18-177:3, 197:5-199:20; *see also* Johnson Decl. ¶¶ 7, 8, 10.)

Indeed, according to witness testimony, two therapy assistants—an occupational

therapy assistant and a physical therapy assistant—were typically present in the Wellness

Center, and they worked as a team to guide patients through a circuit of exercises.

(Johnson Dep. 82:23-87:11; Weiche Dep. 27:8-14.)  Both therapy assistants worked with

most patients in a given session, regardless of whether a therapist had ordered

occupational therapy or physical therapy for a particular patient.  (Johnson Dep.

82:23-87:11, 174:18-177:3; Um'rani Decl. ¶ 22, Ex. 22 ("Quinnell Dep.") at 25:9-27:17,

14

90:1-91:15; *see also* Johnson Decl. ¶ 8.)  Then, at the end of the day, for billing purposes, the therapy assistants divided the therapy minutes equally, allotting occupational therapy minutes to the occupational therapy assistant and physical therapy minutes to the physical therapy assistant.  (Johnson Dep. 82:23-87:11, 174:18-177:3; Quinnell Dep. 25:9-27:17, 90:1-91:15; *see also* Johnson Decl. ¶ 10.)  Further, there is evidence that on some occasions, a therapy assistant staffed the Wellness Center alone and, at the end of the day, "gave" minutes for services outside her discipline to a therapist or therapy assistant working in one of the therapy gyms.  (Johnson Dep. 102:11-24, 197:5-199:20; Johnson Decl. ¶ 7; *see also* Essling Decl. ¶¶ 25-29, Exs. 8-11.)

In light of this evidence, Relators argue that Defendants violated regulations requiring occupational therapy to be provided by professionals licensed in occupational therapy and physical therapy to be provided by professionals licensed in physical therapy. Moreover, Relators identify eight specific instances of such alleged violations.  (Doc. No. 282 at 56-57, 62.)

### 1. Falsity

Defendants argue that Relators' scope-of-license theory fails because Relators cannot establish the FCA's falsity element—that is, they cannot establish that Defendants violated any Medicare regulation or requirement.  First, Defendants argue that a series of e-mails disproves Johnson's testimony regarding the allocation of minutes among therapy assistants in the Wellness Room.  (Doc. No. 237 at 10-13.)  The e-mails at issue provide evidence that, on one occasion, Johnson sat on an exercise bicycle while physical therapy

assistant Shelly Quinnell provided treatment in the Wellness Center, and Johnson subsequently asked Quinnell to share therapy minutes with her.  (Laudon Decl. ¶¶ 7, 9, Exs. 2, 4.)  When physical therapy assistant Todd Hodgin informed rehabilitation coordinator Jessica Weiche and district manager Julie Gobel about the incident, Hodgin noted that "[o]f course, [physical therapy assistant] Shelly [Quinnell] can't bill the OT only people anyway."  (*Id.* ¶ 7, Ex. 2.)

The Court does not agree that the e-mails cited by Defendants disprove Relators' scope-of-license theory.  A reasonable jury could conclude that the e-mails show that Defendants were aware of and approved the practice of allocating minutes by discipline but disapproved of Johnson's alleged demand to take unfair credit for therapy services performed by another therapy assistant when Johnson was not working.  (*See* Doc. No. 282 at 58-59.)  Further, the Court declines to assess the credibility of Johnson's testimony at summary judgment and instead, as it must, views all evidence in the light most favorable to Relators.

Second, Defendants contend that Relators cannot establish falsity because nearly all Hillcrest patients had both occupational therapy and physical therapy Plans of Care and therefore could have received services from either an occupational therapy assistant or a physical therapy assistant.  (Doc. No. 237 at 13.)  Again, the Court disagrees.  Although a patient with both occupational therapy and physical therapy Plans of Care could have received services from any therapy assistant, such therapy assistant could only provide and bill therapy consistent with her licensed discipline.  For example, if an

16

occupational therapy assistant provided services to a patient, she could only bill occupational therapy minutes; she could not "give" the therapy minutes to a physical therapy assistant to bill as physical therapy, even if the patient had an order for physical therapy.

### 2.    Knowledge

Defendants also argue that Relators cannot establish the FCA's knowledge element, because mistakes and inadvertence are not actionable under the FCA.  (Doc. No. 237 at 37 (citing, among other things, *Onnen*, 688 F.3d at 413 n.2)).)  As Defendants point out, some courts have granted summary judgment for FCA defendants in cases where errors occurred but the overall error rate was low.  *E.g., United States v. Prabhu*, 442 F. Supp. 2d 1008, 1034 (D. Nev. 2006).  Here, Defendants argue, Relators challenge only a small percentage of the total number of claims submitted by Defendants; therefore, according to Defendants, summary judgment in favor of Defendants is appropriate. (Doc. No. 237 at 44-45.)  The Court disagrees.  The evidence, when taken in the light most favorable to Relators, suggests that therapy assistants in the Wellness Center routinely entered minutes for therapy that they did not personally provide, and that management was aware of the practice.

### 3.    Materiality

Finally, Defendants argue that the regulatory violations alleged by Relators constitute violations of conditions of participation—not conditions of payment—and therefore any alleged false representation by Defendants was not material.  (*Id.* at 45-49.)

Defendants are incorrect.  As explained above, the distinction between conditions of payment and conditions of participation is not dispositive of the FCA's materiality requirement; instead, courts engage in a fact-intensive inquiry.  *Escobar*, 136 S. Ct. at 2001-04; *see also Onnen*, 688 F.3d at 414-15.  Here, the Court concludes that fact issues remain as to the materiality of the alleged violations.

In sum, the Court finds that genuine issues of material fact preclude summary judgment with respect to claims based on Relators' scope-of-license theory.

### B.    Supervision Theory

Second, Relators claim that Defendants violated the FCA by failing to ensure proper supervision of therapy assistants in the Wellness Center.  (Am. Compl. ¶¶ 3, 11, 12, 14, 15, 16, 22-28, 30.)  Medicare policies provide that occupational therapy assistants must work under the direction and supervision of an occupational therapist, and physical therapy assistants must work under the direction and supervision of a physical therapist. Medicare Benefit Policy Manual, Ch. 15, §§ 230.1.C, 230.2.C; *see also* 42 C.F.R. §§ 409.23(b), 409.44(c)(2)(ii), 410.59(a), 410.60(a), 484.4.  The level and frequency of supervision turns on state law.  Medicare Benefit Policy Manual, Ch. 15, §§ 230.1.C, 230.2.C; *see also* 42 U.S.C. § 1395i-3(d)(4)(A) (requiring facilities to provide services in compliance with state laws); 42 C.F.R. § 483.75(b) (effective to Sept. 30, 2009) (same).

Under Minnesota law, an occupational therapist's supervision of an occupational therapy assistant's performance of treatment procedures must involve regular, "face-to-face collaboration," including observation and documentation:

> Face-to-face collaboration between the occupational therapist and the
> occupational therapy assistant shall occur, at a minimum, every two weeks,
> during which time the occupational therapist is responsible for: . . .
> (4) conducting or observing treatment procedures for selected clients and
> documenting appropriateness of treatment procedures.

Minn. Stat. § 148.6432, subd. 3(b). "The occupational therapist shall document

compliance with [statutory supervision requirements] in the client's file or chart." *Id.*

§ 148.6432, subd. 3(d). Further, Medicare policy states that an occupational therapy

assistant "may not provide evaluative or assessment services, make clinical judgments or

decisions; develop, manage, or furnish skilled maintenance program services; or take

responsibility for the service." Medicare Benefit Policy Manual, Ch. 15, § 230.2.C.

Similarly, under Minnesota law, a physical therapist's supervision of a physical

therapy assistant requires observation and documentation:

> When components of a patient's treatment are delegated to a physical
> therapist assistant, a physical therapist must provide on-site observation of
> the treatment and documentation of its appropriateness at least every six
> treatment sessions.

Minn. Stat. § 148.706, subd. 3. Minnesota law also provides that a physical therapist

may not delegate the following activities to a physical therapy assistant: "patient

evaluation, treatment planning, initial treatment, change of treatment, and initial or final

documentation." *Id.* § 148.706, subd. 2.

Relators submit evidence that therapists at Hillcrest failed to properly delegate

duties to therapy assistants in the Wellness Center and that therapists failed to satisfy

minimum supervision requirements as to the therapy assistants in the Wellness Center.

19

First, Relators provide evidence that therapy assistants in the Wellness Center did not receive proper training from the therapists who delegated duties to them.  Johnson, an occupational therapy assistant, testified that Hodgin, a physical therapy assistant, trained her regarding the occupational therapy that she provided in the Wellness Center. (Johnson Dep. 85:8-87:2; Johnson Decl. ¶ 3; *see also* Hodgin Dep. 51:5-51:14, 105:9-106:12.)  Johnson also testified that she trained Quinnell, a physical therapy assistant who worked in the Wellness Center.  (Johnson Decl. ¶ 3; *see also* Quinnell Dep. 23:21-24:12.)

Second, Relators point to evidence that therapists failed to give adequate guidance to the therapy assistants to whom they delegated duties.  According to Hodgin, therapists and Wellness Center therapy assistants often did not discuss an individual patient at the beginning of the patient's treatment in the Wellness Center.  (Hodgin Dep. 39:8-40:4.) Instead, the therapy assistants in the Wellness Center would receive a Nautilus Log with the patient's name and a short diagnosis.  (Hodgin Dep. 31:14-33:12; *see also* Gobel Dep. 13:20-14:2.)  Sometimes the blank for the therapist initiating the program was empty or was filled in with the name of a therapy assistant, rather than a therapist with the authority to delegate.  (Quinnell Dep. 61:4-10; Laudon Decl. ¶ 8, Ex. 3.)  According to Johnson, the Nautilus Logs—which therapy assistants used to record the equipment, repetitions, and resistance levels used by patients—were not typically shared with the therapists who delegated duties to the therapy assistants.  (Johnson Decl. ¶ 3; *see also* Hodgin Dep. 61:18-62:22; Um'rani Decl. ¶ 12, Ex. 12 ("Yap Dep.") at 75:3-25.)

Third, Relators submit evidence that therapists did not personally observe the therapy assistants in the Wellness Center.  According to Hodgin, the occupational therapists and physical therapists did not regularly visit the Wellness Center.  (Hodgin Dep. 62:23-65:23; *see also* Weiche Dep. 46:10-15, 105:2-22.)  Indeed, Julieta Yap, a physical therapist, testified that she did not routinely observe physical therapy assistant Hodgin while he was providing physical therapy services in the Wellness Center.  (Yap Dep. 47:21-48:14.)  Johnson also testified that no occupational therapist personally observed her in the Wellness Center during her time there.  (Johnson Decl. ¶ 12.)  Similarly, Quinnell testified that no physical therapist observed her while physically present in the Wellness Center.  (Quinnell Dep. 51:8-10; *see also id.* 54:12-23.)

According to several witnesses, instead of in-person observation, therapists supervised therapy assistants during weekly meetings, involving all therapists and therapy assistants discussing 20 to 40 patients over the course of 30 to 60 minutes.  (*Id.* 52:13-54:11; Weiche Dep. 105:2-22; Yap Dep. 50:7-22; Hodgin Dep. 80:4-82:21; Um'rani Decl. ¶ 14, Ex. 14 ("Janke Dep.") at 23:3-25:19; *id.* ¶ 15, Ex. 15 ("Huynh Dep.") at 81:15-22.)  In addition, Relators provide evidence that patients' medical records do not provide any evidence of on-site observation of treatment provided by therapy assistants in the Wellness Center.  (Essling Decl. ¶ 22; *see also* Yap Dep. 48:15-50:22.)

### 1.    Falsity

Defendants counter that they made no false representation regarding compliance with supervision requirements because Defendants in fact complied.  First, Defendants

21

point out that the parties agree that all therapists and therapy assistants engaged in weekly

meetings, and Yap testified that therapists observed and communicated with therapy

assistants constantly.  (Doc. No. 237 at 36-37.)  Second, Defendants stress that their

expert witnesses opine that patients' medical records demonstrate compliance with

federal and state laws regarding documentation of supervision.  (*Id.* at 37.)  In light of the

evidence submitted by Relators, however, neither of Defendants' arguments persuades

the Court that summary judgment is appropriate.  Rather, the evidence put forth by

Relators presents a factual dispute.

### 2.    Knowledge

Defendants next argue that they did not knowingly violate Medicare's supervision

requirements, because Defendants reasonably interpreted Minnesota law, and no formal

guidance warned Defendants away from their interpretation.  (*Id.* at 41-42.)  As noted

above, Defendants cannot be liable if the supervision requirements were *ambiguous*,

Defendants acted pursuant to an *objectively reasonable* interpretation of the

requirements, and *no formal government guidance* existed contrary to that interpretation.

*Donegan*, 833 F.3d at 878-79.

Here, the Court finds that Minnesota's statutory supervision requirements are

unambiguous, and thus Defendants' argument fails.  Under Minn. Stat. § 148.6432, the

occupational therapist and the occupational therapy assistant must engage in face-to-face

collaboration every two weeks, and such collaboration must include "conducting or

observing treatment procedures."  Similarly, under Minn. Stat. § 148.706, the physical

therapist must provide "on-site observation" of the aspects of a patient's treatment that were delegated to the physical therapy assistant at least every six treatment sessions.  In the Court's view, Minnesota law clearly requires occupational and physical therapists to conduct or observe treatment procedures *in-person* as part of their supervision of therapy assistants; merely meeting to discuss patients is insufficient.

### 3.    Materiality

Last, Defendants contend that Relators cannot satisfy the FCA's materiality requirement.  (Doc. No. 237 at 25.)  The Court, however, rejects Defendants' argument regarding conditions of payment and conditions of participation and concludes that fact issues preclude summary judgment.

In sum, as with claims based on Relators' scope-of-license theory, the Court finds that genuine issues of material fact preclude summary judgment with respect to claims based on Relators' supervision theory.

### C.    Documentation Theory

Third, Relators claim that Defendants violated the FCA by failing to properly document therapy provided in the Wellness Center.  (Am. Compl. ¶¶ 3, 15, 16, 20, 29, 30, 32.)  Relators provide evidence that the medical records of patients treated in the Wellness Center generally did not include any information about the Wellness Center or the treatments that patients received there.  (Essling Decl. ¶¶ 20-22.)  Relators, however, do not dispute that medical records contained Plans of Care for occupational therapy and physical therapy, as well as progress notes.  (Doc. No. 282 at 73.)  The issue is whether

Medicare regulations required Defendants to provide information specific to Wellness

Center treatments, as opposed to treatments a patient received in other settings, such as

the occupational therapy or physical therapy gyms.  (*See id.* at 43-44, 47-50, 73, 77.)

While Defendants maintain that Relators cannot satisfy any of the elements of an

FCA claim (falsity, knowledge, or materiality), the Court focuses on the knowledge

element, which is dispositive.  As noted above, Defendants did not act knowingly if the

documentation requirements were *ambiguous*, Defendants acted pursuant to an

*objectively reasonable* interpretation of the requirements, and *no formal government*

*guidance* existed contrary to that interpretation.  *Donegan*, 833 F.3d at 878-79.

Relators allege that Defendants violated the former 42 C.F.R. § 483.75(*l*), under

which Defendants had an obligation to maintain medical records "in accordance with

accepted professional standards and practices."  42 C.F.R. § 483.75(*l*)(1) (effective to

Sept. 30, 2009).  The records must be "[c]omplete," "[a]ccurately documented,"

"[r]eadily accessible," and "[s]ystematically organized."  *Id.*  And, they must contain,

among other things, "[t]he plan of care and services provided" and "[p]rogress notes."

*Id.* § 483.75(*l*)(5).

First, the Court finds that the former 42 C.F.R. § 483.75(*l*) is ambiguous with

respect to the level of detail required in the medical records.  *See Donegan*, 833 F.3d

at 878.  While the regulation plainly requires a Plan of Care and progress notes, the

regulation does not specify, for example, whether all services provided to the patient

must be separately described or whether progress notes must be maintained with respect to every aspect of a patient's treatment.

Second, the Court finds that Defendants' interpretation of the former 42 C.F.R. § 483.75(*l*) is objectively reasonable. *See Donegan*, 833 F.3d at 879. On the record before the Court, it appears that Defendants interpreted the regulation as requiring that each medical record: (1) contain a Plan of Care, a description of services provided to the patient, and progress notes; and (2) reflect the patient's overall treatment plan, without necessarily expressly differentiating between aspects of the plan that took place in the therapy gyms as opposed to the Wellness Center. (*E.g.,* Laudon Decl. ¶ 16, Ex. 11; Um'rani Decl. ¶ 37, Ex. 37.) In short, Defendants interpreted the regulation as requiring the elements expressly identified in the regulation, an interpretation that the Court deems reasonable.

Third, the Court finds that Relators have not provided sufficient evidence of government guidance that warned Defendants away from their interpretation of the former 42 C.F.R. § 483.75(*l*)'s documentation requirements. *See Donegan*, 833 F.3d at 879-80. Relators, for example, point to no federal appellate decision or official guidance from CMS or HHS that would have advised Defendants that they had to include information specific to the Wellness Center in medical records. *See Purcell*, 807 F.3d at 289 (citing *Safeco*, 551 U.S. at 70). While Relators note that 42 C.F.R. §§ 409.17(c)(1) and 410.61(c) require Plans of Care to include the patient's diagnosis, the anticipated goals of skilled therapy, and the type, amount, frequency, and duration of the skilled

therapy, these regulations shed little if any light on Defendants' alleged obligation to expressly reference therapy provided in the Wellness Center.  (*See* Doc. No. 282 at 20.) Indeed, Relators concede that "there is no mandated form for the documentation that must be kept."  (*Id.* at 77.)

Further, while Relators point to guidelines by the American Physical Therapy Association and WPS, a Claims Review contractor (*see id.* at 22-23, 27), these sources do not constitute authoritative government guidance for purposes of the FCA's knowledge element.  *See Donegan*, 833 F.3d at 880; *Purcell*, 807 F.3d at 289-90.  Similarly, although the documents used by Aegis to train its employees may suggest that Aegis' internal policy required medical records to include Nautilus Logs (*see* Doc. No. 258 ("Besch Decl.") ¶ 4, Ex. A at 43-44, 101-02), Aegis' policies do not establish that Aegis *knew* that failing to include Nautilus Logs in medical records violated Medicare regulations.  *See United States ex rel. Kersulis v. RehabCare Grp., Inc.*, Civ. No. 00-636, 2007 WL 294122, at *10 (E.D. Ark. Jan. 29, 2007); *see also Purcell*, 807 F.3d at 290.

In short, the Court determines that Defendants are entitled to summary judgment with respect to claims based on Relators' documentation theory, because Relators have failed to submit evidence that Defendants *knew* that Medicare regulations required them to specifically include information about the Wellness Center in medical records.  While Defendants' documentation of Wellness Center therapy may have fallen short of best practices, any such shortcoming does not rise to the level of a knowing violation as required by the FCA.  *See Purcell*, 807 F.3d at 291 ("That [defendant's] interpretation

26

may not be the best interpretation does not demonstrate that [defendant's] interpretation was necessarily unreasonable.").

### D.   Group Therapy Theory

Fourth, Relators claim that Defendants violated the FCA by improperly characterizing group therapy as individual therapy.  (Am. Compl. ¶¶ 3, 17, 20, 30, 32.) Relators claim, and Defendants do not dispute, that Defendants used standardized Current Procedural Terminology ("CPT") codes to bill for skilled services under both Part A and Part B; that therapy assistants used CPT code 97110, for therapeutic exercise, to bill for services provided in the Wellness Center; and that CPT code 97110 is limited to one-on-one service and does not extend to group therapy.  (Doc. No. 282 at 51 & n.33, 67.)

Under both Part A and Part B, CMS has provided guidance regarding therapy simultaneously provided to multiple patients.  With respect to Part A, CMS has distinguished concurrent therapy from group therapy:  "In a concurrent model, the therapist works with multiple patients at the same time, each of whom can be receiving different therapy treatments," whereas in a group model, "one therapist provides the same services to everyone in the group."  Medicare Program; Prospective Payment System & Consolidated Billing for Skilled Nursing Facilities for FY 2010; Minimum Data Set, Version 3.0 for Skilled Nursing Facilities & Medicaid Nursing Facilities, 74 Fed. Reg. 40,288, 40,315 (Aug. 11, 2009) (final rule codified at 42 C.F.R. pt. 483).  In addition, CMS has indicated that therapy services provided in a concurrent model usually

27

do not qualify as skilled services:  "If the therapist or therapy assistant can provide

distinct services to several beneficiaries at once [in a concurrent model], then it is

unlikely that the services are sufficiently complex and sophisticated to qualify for

coverage under the Medicare guidelines."  Medicare Program; Prospective Payment

System & Consolidated Billing for Skilled Nursing Facilities—Update, 66 Fed.

Reg. 23,984, 23,992 (May 10, 2001) (proposed rule to be codified at 42 C.F.R. pts. 410,

411, 413, 424, 482, 489).

As to Part B, CMS has distinguished between intermittent therapy and group

therapy.  (Laudon Decl. ¶ 11, Ex. 6 ("11 Part B Billing Scenarios for PTs & OTs") ¶ 3.)

Intermittent therapy involves episodes of direct one-on-one service to a single patient that

are interrupted by episodes of treating other patients.  *Id.*  It can be billed as individual

therapy so long as the therapist or therapy assistant tracks identifiable episodes of direct

one-on-one service, each "of a sufficient length of time to provide the appropriate skilled

treatment."  *See id.*  In contrast to intermittent therapy, "[g]roup therapy consists of

simultaneous treatment to two or more patients *who may or may not be doing the same

activities*."  *Id.* (emphasis added).  Thus, group therapy under Part B differs from group

therapy under Part A, and in fact, therapy that would be deemed concurrent under Part A

could be deemed group therapy under Part B.  *See id.*

Relators submit evidence that therapy assistants provided group therapy in the

Wellness Center, even though they billed the therapy as individual therapeutic exercise.

According to multiple witnesses, one or two therapy assistants often simultaneously

monitored multiple patients in the Wellness Center with each patient using a different piece of strength-training equipment.  (*E.g.,* Johnson Dep. 83:2-84:25; Hodgin Dep. 47:17-48:9.)  In addition, Relators point to a series of e-mails initiated by Mark Richards, an Aegis physical therapist who ran the fitness program carried out in the Wellness Center.  (Laudon Decl. ¶ 19, Ex. 14; Hodgin Dep. 28:3-19.)  In his e-mails, Richards expresses concern to Weiche and Gobel that therapy assistants in the Wellness Center were providing group therapy and improperly billing it as individual therapy.  (Laudon Decl. ¶ 19, Ex. 14.)  Relators also submit evidence that therapy assistants in the Wellness Center did not track the time they spent with individual patients, as required for intermittent therapy under Part B.  (Johnson Dep. 171:9-173:11; 183:16-185:9; Johnson Decl. ¶¶ 4, 8, Ex. 1; Um'rani Decl. ¶ 52, Ex. 52 ("Cayman Dep.") at 202:9-203:9.)

### 1.  Falsity

Defendants argue that that therapy provided in the Wellness Center qualified as either concurrent therapy under Part A or intermittent therapy under Part B, and thus, no false representation occurred.  (Doc. No. 237 at 20-23.)  Specifically, Defendants contend that the therapy assistants in the Wellness Center could not have provided group therapy because the parties agree that the patients in the Wellness Center were doing different activities on different pieces of equipment at any given moment.  (*Id.*)

The Court disagrees that the simultaneously-supervised patients' performance of *different* exercises disposes of the FCA's falsity requirement.  Even though multiple patients did not use the same piece of equipment at the same time, multiple patients

performed the same circuit of two or four exercises on the same equipment at the same time.  As such, under Part A, patients arguably received the same treatment (a circuit of exercises), meaning that group therapy, not concurrent therapy, may have been provided. Further, CMS guidance provides that concurrent therapy under Part A does not typically involve skilled services.  Medicare Program; Prospective Payment System & Consolidated Billing for Skilled Nursing Facilities—Update, 66 Fed. Reg. at 23,992. Thus, even if Defendants are correct that therapy in the Wellness Center was concurrent, it is possible that it was not covered by Medicare because the therapy was not skilled.

Under Part B, providing different services to multiple patients at the same time is deemed group therapy, unless the therapist or therapy assistant tracks identifiable episodes of direct one-on-one service.  11 Part B Billing Scenarios for PTs & OTs.  As such, even if Defendants are correct that therapy in the Wellness Center was concurrent under Part A, such therapy would not necessarily qualify as intermittent therapy under Part B.

## 2. Knowledge

Defendants also argue that they are entitled to summary judgment because they did not knowingly bill group therapy as individual therapy.  (Doc. No. 237 at 20.) Defendants do not argue, however, that CPT code 97110 or an applicable regulation is ambiguous.  (*See id.* at 20-23, 41.)  Indeed, Defendants do not provide a supporting argument specific to Relators' group therapy theory.  (*See id.*)

### 3.      Materiality

Finally, to the extent Defendants argue that they are entitled to summary judgment because Relators cannot satisfy the FCA's materiality requirement, the Court disagrees. (*See id.* at 45-49.)  As noted above, the distinction between conditions of payment and conditions of participation is not dispositive of the FCA's materiality requirement. *Escobar*, 136 S. Ct. at 2001-04.

In conclusion, the Court finds that genuine issues of material fact preclude summary judgment with respect to claims based on Relators' group therapy theory.

### E.      Skilled Services Theory

Fifth, Relators claim that Defendants violated the FCA by mischaracterizing the monitoring of exercises performed by residents in the Wellness Center as provision of skilled services.  (Am. Compl. ¶¶ 3, 4, 10-17, 20, 27, 30, 32.)  Medicare regulations provide that CMS only covers therapy services to the extent they are skilled services.  42 C.F.R. §§ 409.30, 409.31; Medicare Benefit Policy Manual, Ch. 15, § 220.2.A.  Under Part A, skilled services are those that are "so inherently complex that [they] can be safely and effectively performed only by, or under the supervision of, professional or technical personnel."  42 C.F.R. § 409.32(a).  They do not include, for example, "[g]eneral supervision of exercises, which have been taught to the patient and the performance of repetitious exercises that do not require skilled rehabilitation personnel for their performance."  Medicare Benefit Policy Manual, Ch. 8, § 30.5.  Similarly, under Part B, "general exercises to promote overall fitness and flexibility" are not skilled services.

31

Medicare Benefit Policy Manual, Ch. 15, § 220.2.A.  As noted above, CMS has indicated that therapy services provided in a concurrent model usually do not qualify as skilled services.  Medicare Program; Prospective Payment System & Consolidated Billing for Skilled Nursing Facilities—Update, 66 Fed. Reg. at 23992.

The parties agree that the patients who received services in the Wellness Center were in need of skilled services.  (Doc. No. 282 at 63.)  Relators argue, however, that the services provided to these patients in the Wellness Center were not in fact skilled.  (*Id.*)  They submit evidence that therapy assistants in the Wellness Center supervised multiple patients who each performed the same circuit of two or four exercises on the same equipment.  (Johnson Dep. 83:2-84:25, 183: 16-184:15; Hodgin Dep. 47:17-48:9; Quinnell Dep. 25:9-25.)  Further, Relators point to evidence that therapists and therapy assistants did not keep progress notes with respect to services provided in the Wellness Center, and that therapy assistants provided the same Wellness Center services to Hillcrest community members who were not under therapy Plans of Care as they did to Medicare patients.  (Hodgin Dep. 58:17-20, 69:12-16; Weiche Dep. 40:14-42:6; Quinnell Dep. 75:11-18; Huynh Dep. 29:18-31:18; Johnson Decl. ¶ 11.)

In addition, Relators present evidence that Nautilus Logs—the only written records of the specific services provided in the Wellness Center—were not generally included in medical records, that therapy assistants rarely looked at patients' therapy Plans of Care, and that therapists rarely visited the Wellness Center.  (Weiche Dep. 42:13-43:4, 46:10-15, 105:2-22; Hodgin Dep. 38:22-39:7, 62:23-65:23, 67:22-69:1;

Johnson Dep. 182:2-16.) Moreover, although each patient had a Plan of Care, patients did not have individualized programs for the Wellness Center. Rather, as evidenced by the Nautilus Logs, therapy was standardized, and in fact, therapy assistants often began each patient at the same resistance level and then made adjustments if an exercise seemed too easy or too difficult for a given patient. (Laudon Decl. ¶ 8, Ex. 3; Quinnell Dep. 61:4-64:23; Huynh Dep. 36:3-39:8.) Finally, Relators' expert Elisa Bovee opines that the services provided in the Wellness Center were not skilled services. (Bovee Rep. at 38-39, 60-65.)

### 1. Falsity

Defendants make two arguments in opposition to Relators' assertion that Defendants' Medicare claims were false due to Defendants' misrepresentation of the services Defendants provided. First, Defendants contend that all patients identified by Relators were in need of skilled services. (Doc. No. 237 at 14-15, 18-19.) Relators agree. (Doc. No. 282 at 63.) But the fact that patients needed skilled services does not prove that Defendants in fact provided them.

Second, Defendants argue that the services provided in the Wellness Center were skilled to the extent that they required the judgment, knowledge, and skills of a qualified therapist. (Doc. No. 237 at 19-20.) Defendants submit evidence that the therapy provided in the Wellness Center was part of a strength-building program designed specifically for elderly individuals and based on extensive clinical research. (Besch Decl. ¶¶ 5-11.) Further, they submit the report of expert witness John Stearns, who opines that

the services provided in the Wellness Room "were skilled services that required licensed personnel to administer and supervise either due to the complexity of the treatment plan or the underlying condition of the patient." (Doc. No. 256 ("Stearns Decl.") ¶ 5, Ex. A ("Stearns Rep.") ¶ 52.) While Defendants' evidence provides some support for Defendants' argument, the Court concludes that fact disputes preclude summary judgment as to whether Defendants in fact provided skilled services as required by Medicare.

### 2.    Knowledge

Next, Defendants contend that Relators cannot satisfy the FCA's knowledge requirement. (Doc. No. 237 at 20, 41-45 & n.21.) Specifically, Defendants assert that Relators fail to point to official government guidance that would have warned Defendants away from their interpretation of "skilled services." (*Id.* at 41-42) Defendants, however, do not argue that any Medicare regulation or policy regarding skilled services was ambiguous, and they fail to develop an argument specific to Relators' skilled services theory. (*See id.*) In a footnote, Defendants implicitly argue that the false representations alleged by Relators are based on a scientific disagreement between Defendants and Relators, and that such disagreement cannot give rise to FCA liability. (*Id.* at 42 n.21 (citing, among other things, *United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992), *overruled on other grounds by United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015) (en banc)).) Defendants, however, fail to elaborate on the scientific disagreement that they assert exists. The

34

Court concludes that factual disputes preclude the Court from finding, as a matter of law, that Defendants lacked the requisite knowledge under the FCA.

### 3. Materiality

Last, to the extent Defendants contend that Relators cannot satisfy the FCA's materiality requirement, the Court remains unpersuaded. (*See* Doc. No. 237 at 45-49.) As explained in more detail above, the Court rejects Defendants' argument that only violations of express conditions of payment can give rise to FCA liability. *See Escobar*, 136 S. Ct. at 2001-04. As such, fact disputes exist regarding the materiality of any alleged misrepresentations regarding skilled services.

In sum, the Court concludes that genuine issues of material fact preclude summary judgment with respect to claims based on Relators' skilled services theory.

### F. No-Therapy Theory

Sixth, Relators claim that Defendants violated the FCA by billing CMS for therapy that Defendants did not in fact provide. (Am. Compl. ¶¶ 3, 4, 21, 30, 32.) Unlike Relators' first five theories, Relators' no-therapy theory is not based on allegations that Defendants falsely certified compliance with certain regulatory requirements, and it is not limited to services allegedly provided in the Wellness Center. (*See id.*) Instead, Relators submit evidence of 41 instances when therapists or therapy assistants billed therapy minutes to CMS, even though progress notes reflect that no therapy was provided. (Laudon Decl. ¶ 20, Ex. 15 ("HDR's Interrog. Ans.") at Ans. 17.) For example, Relators provide evidence that patient P.P.'s medical record stated that P.P. was "[n]ot seen, out of

facility"; yet, on the same day, a physical therapy assistant billed 30 minutes of therapeutic exercise.  (*Id.*)

Relators, however, do not claim that Defendants billed CMS for therapy that Johnson purportedly provided—but did not actually provide—as Johnson testified that she provided therapy whenever she recorded therapy minutes.  (Doc. No. 282 at 70 n.41; *see also* Johnson Dep. 55:20-79:9.)

### 1.    Falsity

Defendants counter that they made no false representation because therapy billed was always in fact provided.  (Doc. No. 237 at 23-24.)  They contend that Relators lack evidence to support their no-therapy theory, and that all testimonial evidence contradicts Relators' claims.  (*Id.*)  Defendants point to Weiche's testimony that Aegis' "policy" was to "accurately" complete CPT logs, which show the CPT code for the therapy provided to a particular patient, the date, the number of minutes of therapy, and the therapist or therapy assistant who provided therapy.  (Weiche Dep. at 90:21-91:2.)  Indeed, Yap testified that she completed CPT logs accurately.  (Yap Dep. 124:15-17.)  In addition, both occupational therapy assistant Deb Janke and physical therapy assistant Margo Lindgren testified that they never billed for therapy that was not provided.  (Janke Dep. 50:17-19; Um'rani Decl. ¶ 13, Ex. 13 ("Lindgren Dep.") at 52:10-13.)  Finally, there is evidence that Aegis' practice was to approach a patient three different times to offer therapy; thus, it is possible that a particular patient could initially refuse therapy before accepting therapy later in the day.  (*See* Weiche Dep. 80:12-81:15.)

36

Although Defendants are correct that some evidence in the record contradicts Relators' no-therapy theory, the Court concludes that Relators' evidence is sufficient to raise fact issues that preclude summary judgment.

### 2.   Knowledge

Defendants also contend that even if Relators could establish the falsity element of an FCA claim, they cannot establish the knowledge element, because the alleged error rate was low. (Doc. No. 237 at 44-45.) Just as the Court rejects this argument with respect to Relators' scope-of-license theory, it rejects it with respect to Relators' no-therapy theory. The evidence, when taken in the light most favorable to Relators, suggests that therapists and therapy assistants recorded therapy minutes for therapy that they did not actually provide. The Court cannot conclude, as a matter of law, that Defendants did not possess the requisite knowledge under the FCA.

### 3.   Materiality

Finally, to the extent Defendants contend that Relators cannot satisfy the FCA's materiality requirement, the Court rejects that argument. (*See id.* at 45-49.) As the Court has repeatedly explained, Defendants' argument regarding conditions of payment and conditions of participation fails. *See Escobar*, 136 S. Ct. at 2001-04. Further, to the extent Defendants argue that actual provision of therapy services is not material to payment for such services, the Court is unpersuaded.

In conclusion, the Court finds that genuine issues of material fact preclude summary judgment with respect to claims based on Relators' no-therapy theory.

### G.    Timekeeping Theory

Seventh, Relators allege that Defendants violated the FCA by failing to accurately track and record the time that patients received services in the Wellness Center.  (Doc. No. 282 at 52-53.)  Specifically, Relators claim that therapy assistants in the Wellness Center recorded a pre-determined number of therapy minutes based on the number of machines that a patient was to use, rather than timing and recording the actual amount of time that therapy assistants spent providing services to a patient.  (*Id.*)  Defendants counter that Relators' claim based on these allegations should be dismissed because Relators did not allege this theory of liability in the Amended Complaint.  (Doc. No. 237 at 49-50.)  Relators, however, contend that the Court should consider the timekeeping theory because record evidence supports the theory and because the Amended Complaint asserts that Relators violated the FCA through the specific conduct alleged in the Amended Complaint "among other things."  (Doc. No. 282 at 79-81 (citing Am. Compl. ¶ 3).)

Although Relators' timekeeping theory may be meritorious, the Court agrees with Defendants.  "A relator may not assert new theories of liability based on information learned during discovery."  *Donegan*, 2015 WL 3616640, at *7.  Further, Relators' use of the phrase "among other things" does not relieve Relators of their duty to plead fraud with particularity under Rule 9(b).  *See* Fed. R. Civ. P. 9(b); *Donegan*, 2015 WL 3616640 at *7.  Indeed, Relators' timekeeping theory describes a scheme distinct from the conduct described in the Amended Complaint and, as such, the Court cannot now consider it.  *See*

*Donegan*, 2015 WL 3616640 at *7.  Thus, the Court grants Defendants' summary

judgment motion as to claims based on Relators' timekeeping theory.

### H.    Certification Theory

Eighth and finally, Relators claim that Defendants violated the FCA by submitting

claims under Part B for services provided to patients with no physician-certified Plan of

Care in their medical record.  (Doc. No. 282 at 20, 80.)  As Defendants point out,

Relators' certification theory—like Relators' timekeeping theory—is not specifically pled

in the Amended Complaint.  (Doc. No. 237 at 49-50.)  Accordingly, even though

Relators' certification theory may be meritorious, the Court may not consider it.  *See*

*Donegan*, 2015 WL 3616640 at *7.  For this reason, the Court grants Defendants'

summary judgment motion as to claims based on Relators' certification theory.

## III.    Motions to Exclude Expert Testimony

Next, the Court addresses the *Daubert* motions filed by the parties.  Defendants

move to exclude two expert witnesses identified by Relators—Elisa Bovee and Mark

Essling—and Relators move to exclude two expert witnesses identified by Defendants—

Steven Pelovitz and Sheila Lambowitz.

### A.    *Daubert* Standard

Before accepting the testimony of an expert witness, the trial court is charged with

the "gatekeeper" function of determining whether an opinion is both relevant and

reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993); *Aviva*

*Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 820 (D. Minn. 2011).

Under Federal Rule of Evidence 702, which governs the admission of expert testimony, a duly qualified expert may testify if: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

Rule 702 recognizes five bases for expert qualification: "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. While an expert witness must be qualified to testify in a given subject area, the requirement is not rigorous, and "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 726 (8th Cir. 2015) (quoting *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006)).

The Court also notes that "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and it favors admissibility over exclusion. *Lauzon*, 270 F.3d at 686 (quoting *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir. 1999)). When examining an expert opinion, a court applies a general rule that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th

Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).

"[I]f the expert's opinion is so fundamentally unsupported that it can offer no assistance

to the jury," then it must be excluded. *Id.* at 929-30.  In *Kumho Tire Co. v. Carmichael*,

526 U.S. 137, 152 (1999), the Supreme Court concluded that "the trial judge must have

considerable leeway in deciding in a particular case how to go about determining whether

particular expert testimony is reliable."  The proponent of the evidence has the burden of

establishing by a preponderance of the evidence that testimony is admissible.  *Lauzon*,

270 F.3d at 686.

### B.     Relators' Expert Elisa Bovee

Defendants move to exclude the testimony of Relators' expert Elisa Bovee.  (Doc.

No. 260.)  Bovee has worked in the long-term care industry for more than 20 years,

including work as an occupational therapist, director of rehabilitation therapy, Medicare

appeals coordinator, and consultant in Medicare compliance.  (Bovee Rep. at 2-5.)  She

intends to testify about Medicare requirements for the provision of therapy in SNFs, and,

based on a set of facts she assumes for the purpose of stating her opinion, she intends to

opine that Defendants' claims related to Wellness Center therapy would be considered

false by Medicare.  (*See generally* Bovee Rep.)  Although Defendants do not contest

Bovee's qualifications, they argue that Bovee's testimony should be excluded for two

reasons:  (1) Bovee relied on flawed methodology; and (2) Bovee's opinions will not

assist the factfinder.  (Doc. No. 262 at 6-18, 31-34.)

### 1.     Methodology

Defendants start by arguing that Bovee utilized flawed methodology in reaching

her conclusions.  Specifically, they raise two arguments.  First, Defendants contend that

Bovee improperly relies on an incomplete set of facts she assumes to be accurate, while

ignoring evidence that contradicts those facts.  (*Id.* at 6-15.)  As Relators point out,

however, Bovee based her opinions on numerous documents in the record, including

patient records, deposition transcripts, and e-mails.  (Bovee Rep. at 4, Ex. 5.)  Despite

some contradictory evidence, the record generally lends support to Bovee's description of

the facts in this case—although some facts are genuinely disputed.  Further, any true

factual inaccuracies in Bovee's account appear to be minor.

Second, Defendants assert that Bovee relied on incorrect, nonbinding, or

nonexistent standards for Medicare documentation and group therapy.  (Doc. No. 262 at

15-18.)  Relators, however, argue that Bovee relied on a variety of sources of guidance

with respect to Medicare compliance—including standards published by CMS, a CMS

Claims Review contractor, and a national professional services organization—and that

experts in the field of Medicare compliance would reasonably rely on such sources.

(Doc. No. 281 at 16-18.)

The Court concludes that excluding Bovee's opinion testimony due to flawed

methodology would be inappropriate.  Instead, Defendants may cross-examine Bovee on

the factual bases for her opinions and the standards she employed to reach her

conclusions.  At the same time, the Court assumes that Bovee does not intend to testify

about accuracy or existence of the "assumed facts" upon which Bovee relies.  (*See* Bovee Rep. at 40-59.)  Indeed, the Court believes that the factfinder is fully capable of assessing the evidence to reach reliable conclusions regarding, for example, which individuals worked in the Wellness Center and what training Johnson received.  *See, e.g.*, *United States v. Coutentos*, 651 F.3d 809, 821 (8th Cir. 2011) ("Where the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous.") (quoting *Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269, 270 (8th Cir. 1984)).  Thus, to the extent that Bovee's proposed testimony encroaches the role of the factfinder, such testimony is excluded.

### 2.      Assistance to Factfinder

Defendants also contend that Bovee's testimony should be excluded because it will not help the factfinder.  (Doc. No. 262 at 31-34.)  According to Defendants, the Court should exclude Bovee's so-called "as-applied opinions" (Bovee Report at 71-77) as improper legal conclusions.  The Court agrees.  The Eighth Circuit has expressly recognized, "expert testimony on legal matters is not admissible.  Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them."  *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (internal citation omitted).  Moreover, while Federal Rule of Evidence 704 states that "[a]n opinion is not objectionable just because it embraces an ultimate issue," it does not—as Relators appear to suggest—authorize admission of all testimony regarding ultimate issues.  Fed. R. Evid. 704(a).  Indeed, opinion testimony that does "nothing more for the

43

jury than tell it what verdict to reach" intrudes on both the judge's authority to instruct the jury and the jury's role in determining the verdict.  *See* Victor James Gold, 29 Federal Practice & Procedure, Federal Rules of Evidence § 6265.2 (2d ed.) (updated Apr. 2016). Accordingly, Bovee's proposed "as-applied opinions" are excluded as bare legal conclusions that are unhelpful to the factfinder.

### C.      Relators' Expert Mark Essling

Defendants also move the Court to exclude the testimony of Relators' expert Mark Essling, whose expert opinions primarily relate to the calculation of damages and penalties.  (Doc. No. 260; Um'rani Decl. ¶ 2, Ex. 2 ("Essling Discl."); *id.* ¶ 55, Ex. 55 ("Essling Am. Discl.").)  On November 20, 2015, the deadline for Relators' expert reports, Relators served Essling's initial expert disclosure under Federal Rule of Civil Procedure 26(a)(2)(C).  (Essling Discl. at 8; Doc. No. 222 ("Sched. Order") ¶ 1(a).)  On January 22, 2016, Relators served Essling's amended expert disclosure.  (Essling Am. Discl. at 8.)  On February 4, 2016, Defendants deposed Essling.  (Um'rani Decl. ¶ 19, Ex. 19 ("Essling Expert Dep.").)  In their motion to exclude Essling's testimony, Defendants make three arguments:  (1) Essling is not qualified to offer expert testimony; (2) Essling used flawed methodology; and (3) Essling's opinions will not assist the factfinder.  (Doc. No. 262 at 4-6, 18-34.)

#### 1.      Qualifications

To begin, Defendants argue that Essling is unqualified.  (*Id.* at 4-6.)  Essling is an attorney, and from 1987 to 1995, he served as HDR's outside counsel.  (Essling Decl.

¶ 2.)  In 1995, HDR hired Essling as its Business Administrator and General Counsel, and in approximately 2000, Essling became HDR's CEO.  (*Id.*)  HDR is a provider of physical, occupational, and speech therapy services, and it has provided therapy services in SNFs—like Hillcrest—since 1985.  (*Id.* ¶¶ 3-4.)  While HDR recently shifted its focus away from SNFs, Essling's primary duties at HDR have included learning the rules governing PPS, the system that SNFs use to submit Medicare claims, and educating HDR's therapists and customers regarding those rules.  (*Id.* ¶¶ 4-6.)  Essling intends to offer testimony, based on patient medical records and billing files, regarding Defendants' Medicare claims and the amounts paid by CMS.  (*See generally* Essling Am. Discl.)  Based on the evidence in the record, the Court finds that Essling is qualified to offer this testimony and any gaps in his qualifications go to the credibility of his testimony, not its admissibility.

### 2.    Methodology

Next, Defendants argue that Essling's testimony should be excluded for three reasons related to Essling's methodology.  First, based on certain statements made in Essling's initial expert disclosure, Defendants contend that Essling does not understand PPS.  (Doc. No. 262 at 21-22.)  Relators counter that Essling, in his amended expert disclosure and subsequent deposition, corrected the prior misstatements he had made about PPS.  (Doc. No. 281 at 35-36; Essling Decl. ¶¶ 11-12, Exs. 2-3; Essling Expert Dep. 77:3-79:21.)

45

Second, Defendants contend that Essling's calculations rely on false factual assumptions.  According to Defendants, Essling incorrectly assumed that specific therapy assistants worked in the Wellness Room at times when they did not, and incorrectly assumed that therapy assistants billed a minimum of 20 minutes.  (Doc. No. 262 at 22-25.)  Relators argue that Defendants' poor record-keeping forced Essling to make these assumptions and that they are reasonable under the circumstances.  (Doc. No. 281 at 37.)

Third, Defendants assert that Essling made several miscalculations in his initial expert disclosure.  Specifically, Defendants argue that Essling miscounted days when certain Medicare payment rates applied and ignored co-insurance paid by patients.  (Doc. No. 262 at 25-31.)  As Relators point out, Essling made corrections in his amended expert disclosure.  (*See* Doc. No. 281 at 35, 40.)

Considering the record, the Court declines to exclude Essling's testimony based on any of the three methodological reasons asserted by Defendants.  Instead, Defendants may cross-examine Essling on the factual bases for his opinions, including the methodology Essling used to reach his conclusions.[4]  Further, the Court is unpersuaded

---

[4]     In addition, Defendants' briefing includes a footnote asserting that testimony related to Exhibits A and B to Essling's expert disclosures should be excluded.  (*See* Doc. No. 262 at 31 n.2.)  The Court finds that Defendants may cross-examine Essling with respect to his testimony about Exhibits A and B.  However, the Court excludes Essling's testimony to the extent that it relates solely to theories of liability that the Court has rejected, namely, Relators' documentation theory, timekeeping theory, and certification theory.

by Defendants' argument that Essling's amended expert disclosure was untimely.  Under

Federal Rule of Civil Procedure 26(e), a party has a duty to timely supplement

information disclosed in discovery.  Fed. R. Civ. P. 26(e); *see also, e.g.*, *United States v.*

*STABL, Inc.*, 800 F.3d 476, 487 (8th Cir. 2015).  Here, where no trial date has been

scheduled and Defendants deposed Essling after receiving his amended expert disclosure,

the Court concludes that Essling's amended disclosure was not untimely, and even if it

were, any untimeliness was harmless.  *See STABL*, 800 F.3d at 487-89.

### 3.      Assistance to Factfinder

Finally, Defendants argue that Essling's testimony should be excluded because it

will not assist the factfinder.  (Doc. No. 262 at 31-34.)  Defendants' briefing, however,

merely states:  "Essling does not understand how to count, among other things."  (*Id.*

at 34.)  The Court rejects this unhelpful non-argument.

### D.      Defendants' Expert Steven Pelovitz

Relators, for their part, move the Court to exclude the testimony of Defendant's

expert Steven Pelovitz.  (Doc. No. 239.)  Pelovitz intends to testify about Survey and

Certification, including "tags" with which a state survey team may cite an institution for

failure to comply with Medicare regulations.  (*See generally* Pelovitz Rep.)  Specifically,

Pelovitz will opine that the Minnesota Department of Health ("MDH") would not have

cited Defendants for noncompliance, and even if it had issued a tag, such tag would not

have affected CMS's Medicare payments to Defendants.  (*Id.* ¶¶ 22-42.)  Relators argue

that Pelovitz's testimony should be excluded for three reasons:  (1) it is irrelevant; (2) it is

unreliable; and (3) Pelovitz is unqualified.  (Doc. No. 241 at 1-2.)

### 1.    Relevance

Relators's primary argument for exclusion of Pelovitz's testimony is that it is

irrelevant to the issues in dispute and therefore fails to meet Rule 702's requirement that

expert testimony assist the factfinder.  (*Id.* at 10-22.)  As explained in *Daubert*, "[e]xpert

testimony which does not relate to any issue in the case is not relevant and, ergo,

non-helpful."  *Daubert*, 509 U.S. at 591 (internal citations and quotation marks omitted).

According to Relators, Pelovitz's testimony is unrelated to the issues in the case—

namely, the *falsity* of Defendants' submissions to Medicare, Defendants' *knowledge* of

any falsity, and the *materiality* of any falsity.  (*See* Doc. No. 241 at 10.)  In particular,

Relators stress that a false statement is material if it is capable of influencing payment of

a claim, but that Survey and Certification—the subject of Pelovitz's testimony—has little

if anything to do with payment determinations.  (*Id.* at 13.)  Indeed, Pelovitz testified that

a state survey team would not review billing records or prepare a financial audit.

(Pelovitz Dep. 22:6-25:11.)  He also testified that Survey and Certification does not

involve payment questions and further, that he is not offering opinions on Medicare

coverage or payment decisions.  (*Id.* 62:12-64:9, 79:13-17.)

Defendants respond that Pelovitz's testimony is relevant for two reasons.  First,

according to Defendants, the testimony is relevant to the issue of materiality under the

FCA.  (Doc. No. 290 at 3-9, 19-20.)  Specifically, Defendants contend that "Pelovitz's

testimony will be useful for the jury to understand why the relators' allegations are precisely the type that are typically enforced through administrative mechanisms where the ultimate sanction for violation of such conditions is removal from the government program and hence is a condition of participation and not payment under the FCA." (*Id.* at 3.)  As noted repeatedly above, the distinction between conditions of payment and conditions of participation is not dispositive of materiality. *Escobar*, 136 S. Ct. at 2001-04.  However, whether a Medicare requirement is a condition of participation or a condition of payment is still relevant to materiality. *Id.*  And, administrative enforcement mechanisms and typical government practices for approving and denying claims are relevant to whether a particular regulatory violation would have influence payment. *E.g., Onnen*, 688 F.3d at 414 ("The scope of regulatory requirements and sanctions may affect the fact-intensive issue of whether a specific type of regulatory non-compliance resulted in a materially false claim for a specific government payment.").

In these circumstances, the Court finds that Pelovitz may testify about Survey and Certification, as the existence of administrative enforcement mechanisms may bear on the question of materiality.  However, Pelovitz may not testify as to whether Defendants would have been cited for noncompliance by MDH and whether such citation would have affected payment from CMS to Defendants.  Pelovitz expressly stated that Survey and Certification is separate and distinct from Medicare payment determinations and that Pelovitz offers no opinion on coverage or payment questions.

Second, Defendants argue that Pelovitz's testimony is relevant because the alleged lack of citations issued by MDH to Defendants shows that Defendants could not have knowingly submitted false or fraudulent claims under the FCA.  (Doc. No. 290 at 3-4, 20.)  Defendants' brief, however, offers no citation to evidence for the alleged lack of citations issued by MDH, and Pelovitz's report does not disclose any such testimony by Pelovitz.  (*See id.*; Pelovitz Rep.)  Further, at his deposition, Pelovitz stated that he is "not offering an opinion on the survey reports."  (Pelovitz Dep. at 40:2-41:19.)  The Court concludes that Pelovitz may not testify that Defendants did not in fact receive any citations from MDH or that the lack of such citations indicates that Defendants did not knowingly submit any false claims to CMS.

### 2.    Reliability

Next, Relators argue that Pelovitz's opinion that MDH would not have cited Defendants for noncompliance is unreliable, because Pelovitz's review of patient medical records does not reliably recreate the process by which a Minnesota survey team would have evaluated Defendants' compliance.  (Doc. No. 241 at 24-26.)  Specifically, Pelovitz's opinion is based on a review of available medical records, whereas a survey team would have visited the site and interviewed patients, staff, and management.  (*Id.*)

The Court has already determined that Pelovitz's opinion that MDH would not have cited Defendants is irrelevant and therefore inadmissible.  If, however, the opinion were otherwise admissible, the Court would not exclude it on the basis of Pelovitz's

50

methodology.  Rather, Pelovitz's method for recreating the survey process would go to the weight of Pelovitz's testimony.

### 3.   Qualifications

Finally, Relators contend that Pelovitz is unqualified to opine that MDH would not have cited Defendants for noncompliance, because Pelovitz is not an expert in Minnesota law.  (*Id.* at 22-24.)  In other words, according to Relators, Pelovitz cannot testify that Defendants would not have been cited for violation of Minnesota's statutory requirements if Pelovitz does not claim to be an expert in those requirements.  (*Id.*)

Again, the Court has already determined that Pelovitz's opinion that MDH would not have cited Defendants is inadmissible.  Still, if the opinion were otherwise admissible, the Court would not exclude it on the basis of Pelovitz's qualifications. Rather, Pelovitz's degree of experience with Minnesota law and Minnesota surveys could be the subject of cross-examination by Relators.

### E.   Defendants' Expert Sheila Lambowitz

Relators also move to exclude one of the opinions of Defendants' expert Sheila Lambowitz.  (Doc. No. 242.)  In general, Lambowitz intends to testify about Medicare payments for SNF services during the period from December 2005 through March 2007. (*See generally* Doc. No. 245 ¶ 7, Ex. D ("Lambowitz Rep.").)  Relators ask the Court to exclude Lambowitz's opinion that:  (1) CMS did not require Claims Review contractors to verify supervision of therapy assistants; and (2) as a result, if Defendants' Medicare claims had been reviewed, CMS would have paid them.  (Doc. No. 244 at 1; *see also*

51

Lambowitz Rep. ¶ 33.)  Relators argue that this opinion is irrelevant to the issues in the

case and therefore unhelpful under Rule 702.  (Doc. No. 244 at 1-3.)  According to

Relators, while Lambowitz's opinion may suggest that a Claims Review contractor would

not have *detected* any violations of supervision requirements by Defendants, the issue is

not whether fraud would have been detected but whether fraud in fact occurred.  (*Id.* at

6-8.)

Defendants counter that the opinion that Relators challenge is relevant to the

FCA's materiality and knowledge requirements.  (Doc. No. 288 at 2-3.)  As to

materiality, Defendants contend that Lambowitz's testimony will explain why the

supervision regulations allegedly violated by Defendants were conditions of participation

and therefore cannot give rise to FCA liability.  (*Id.* at 2-14.)  While the distinction

between conditions of payment and conditions of participation is not dispositive of the

materiality inquiry, facts related to the Government's practices in paying or refusing to

pay certain types of claims are relevant.  *See Escobar*, 136 S. Ct. at 2001-04.  Because

Lambowitz's testimony goes to CMS's payment practices, it is relevant and admissible.

Lambowitz will not be permitted, however, to testify about opinions not disclosed in her

expert report.

As to knowledge, Defendants assert that Lambowitz will "explain industry

understanding regarding the application of [the RAI Manual,] which is relevant to" the

reasonableness of Defendants' interpretation of Medicare's supervision and

documentation requirements.  (Doc. No. 288 at 3; *see also id.* at 14-15.)  Lambowitz's

expert report, however, does not disclose an opinion regarding the industry understanding of the application of the RAI Manual.  (*See* Lambowitz Rep.)  Thus, while Lambowitz will be permitted to testify about the RAI Manual to the extent disclosed in her expert report, she will not be permitted to offer undisclosed opinions.

## IV.   Relators' Request to Strike Defendants' Evidence Charts

Finally, the Court briefly addresses Relators' request that this Court strike Defendants' so-called "evidence chart," a 67-page document that Defendants characterize as a summary of material facts (Doc. No. 255 ¶ 1, Ex. A).  (Doc. No. 282 at 81.)  The Court also notes that Defendants filed a similar 96-page chart, which contains evidentiary objections in addition to factual contentions, in connection with their reply brief (Doc. No. 309 ¶ 1, Ex. A).  Further, Defendants filed a 2-page chart purporting to compare Relators' allegations in the Amended Complaint with Relators' positions in their summary judgment briefing (*id.* ¶ 3, Ex. C).  While the Court declines to strike Defendants' charts, the Court cautions Defendants against filing such charts in the future, unless Defendants have received permission from the Court.

### ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion for Summary Judgment (Doc. No. [257]) is

**GRANTED IN PART** and **DENIED IN PART** as follows:

a.      The Court **DENIES** the motion to the extent Defendants move to dismiss claims based on Relators' scope-of-license theory.

b.      The Court **DENIES** the motion to the extent Defendants move to dismiss claims based on Relators' supervision theory.  For purposes of this Order, Relators' supervision theory includes allegations related to:  (1) delegation of treatment from therapists to therapy assistants; (2) supervision of therapy assistants by therapists; and (3) documentation of that supervision.

c.      The Court **GRANTS** the motion to the extent Defendants move to dismiss claims based on Relators' documentation theory.  For purposes of this Order, Relators' documentation theory includes allegations related to documentation of therapy services provided in the Wellness Center but does *not* include allegations related to documentation of supervision of therapy services provided in the Wellness Center.

d.      The Court **DENIES** the motion to the extent Defendants move to dismiss claims based on Relators' group therapy theory.

e.      The Court **DENIES** the motion to the extent Defendants move to dismiss claims based on Relators' skilled services theory.

f.      The Court **DENIES** the motion to the extent Defendants move to dismiss claims based on Relators' no-therapy theory.

g.      The Court **GRANTS** the motion to the extent Defendants move to dismiss claims based on Relators' timekeeping theory.

h.      The Court **GRANTS** the motion to the extent Defendants move to dismiss claims based on Relators' certification theory.

2.      Defendants' Motion to Exclude the Proposed Testimony of Relators' Purported Experts Elisa Bovee and Mark Essling (Doc. No. [260]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.      The Court **GRANTS** the motion to exclude the testimony of Elisa Bovee only to the extent that Bovee's proposed testimony invades the province of the factfinder or the authority of the Court.  Specifically, Bovee may not testify about the existence or accuracy of facts where the factfinder is fully capable of assessing the evidence and reaching reliable conclusions, and Bovee may not testify about the applicable law or give opinions that merely tell the factfinder the verdict that it should reach.

b.      The Court **DENIES** the motion to exclude all other testimony by Elisa Bovee, and it **DENIES** the motion to exclude the testimony of Mark Essling.  The Court notes, however, that neither Bovee nor Essling will be permitted to offer testimony that relates solely to the theories of liability rejected by the Court:  Relators' documentation theory, timekeeping theory, and certification theory.

3.      Relators' Motion to Exclude Testimony of Defendants' Expert Steven A.

Pelovitz (Doc. No. [239]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.      The Court **GRANTS** the motion to the extent that Pelovitz

proposes to testify that:  (1) the Minnesota Department of Health would not

have cited Defendants for noncompliance with Medicare regulations;

(2) even if the Minnesota Department of Health had cited Defendants for

noncompliance, such citation would not have affected CMS's Medicare

payments to Defendants; (3) that Defendants did not in fact receive any

citations from the Minnesota Department of Health; and (4) that the lack of

such citations indicates that Defendants did not knowingly submit false

claims to CMS.  Such testimony is inadmissible.

b.      The Court **DENIES** the motion to the extent that Pelovitz

proposes to otherwise testify about Survey and Certification, including the

procedure for conducting a survey at a facility like Hillcrest and possible

remedies for survey deficiencies.

4.      Relators' Motion to Exclude One of the Opinions of Defendants' Expert

Sheila Lambowitz (Doc. No. [242]) is **DENIED**.  The Court will permit Lambowitz to

testify that:  (1) CMS did not require Claims Review contractors to verify supervision of

therapy assistants; and (2) as a result, if Defendants' Medicare claims had been reviewed,

CMS would have paid them.  The Court will not, however, permit Lambowitz to offer opinions not disclosed in her expert report.

Dated:  December 9, 2016          s/Donovan W. Frank
                                  DONOVAN W. FRANK
                                  United States District Judge