# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America, ex rel., Ricia
Johnson, and Health Dimensions
Rehabilitation, Inc.,

Civil No. 08-1194 (DWF/HB)

Plaintiffs,

v.

**MEMORANDUM
OPINION AND ORDER**

Golden Gate National Senior Care, L.L.C.;
GGNSC Holdings, L.L.C; and GGNSC
Wayzata, L.L.C.; all doing business as
Golden Living Center – Hillcrest of
Wayzata; and Aegis Therapies, Inc.,

Defendants.

---

Jonathan M. Bye, Esq., Ballard Spahr LLP; Lariss Maldonado, Esq., Stinson LLP; and
W. Anders Folk, Assistant United States Attorney, United States Attorney's Office,
counsel for Plaintiffs Ricia Johnson and Health Dimensions Rehabilitation, Inc.

Amy Slusser Conners, Esq., Jennifer L. Olson, Esq., and Thomas Backer Heffelfinger,
Esq., Best & Flanagan LLP; James D. Kremer, Esq., DeWitt Mackall Crounse &
Moore S.C.; Robert Salcido, Esq., Akin Gump Strauss Hauer & Feld LLP; and Kevin
D. Hofman, Esq., Messerlie & Kramer P.A., counsel for Defendants.

Chad A. Blumenfield and Pamela Marentette, Assistant United States Attorneys,
United States Attorney's Office, and Jonathan M. Bye, Esq., Ballard Spahr LLP,
counsel for United States of America.

## INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. No. 486) and Motion for Attorney Fees (Doc. No. 477).  For the reasons set forth below, the Court denies Defendants' motions.

## BACKGROUND

The factual background for the above-entitled matter is clearly and precisely set forth in the Court's December 9, 2016 Memorandum Opinion and Order and is incorporated by reference herein.[1]  (*See* Doc. No. 324 ("Phase I Order").)  In short, this *qui tam* action was filed in 2008.  Relators Ricia Johnson ("Johnson") and Health Dimensions Rehabilitation, Inc. ("HDR") (collectively, "Relators") allege that Defendants Golden Gate National Senior Care, L.L.C., GGNSC Holdings, L.L.C, GGNSC Wayzata, L.L.C., and Aegis Therapies, Inc. ("Defendants") violated the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), by submitting false Medicare claims in connection with Defendants' provision of physical and occupational therapy services to nursing home patients.

Relators' complaint distinguishes between two different time periods.  (Doc. No. 178 ("Am. Compl.") ¶¶ 30-31.)  As a result, the Court divided the case into two phases.[2]  (Doc. No. 115.)  Phase I focused on a single facility (the "Hillcrest facility")

---

[1]     The Court supplements the facts as necessary.

[2]     Discovery was phased such that Phase II would occur only if Relators' claims survived summary judgment as to Phase I.  As discussed below, the Court granted in part and denied in part Defendants' motion for summary judgment with respect to Phase I. (*See generally* Phase I Order.)

from December 2005 through March 2007.  (*Id.*)[3]  Phase II, currently before the Court,

originally focused on nationwide allegations on dates outside of the Phase I time period.[4]

Phase II was further phased and ultimately limited to just the Hillcrest Facility from May

2002 through November 2005 and April 2007 through March 2012.  (Doc. Nos. 337, 378,

396, 420, 432.)

    Relators' Amended Complaint asserts four causes of action under the FCA:

(1) false claims for payment to the Government in violation of 31 U.S.C. § 3729(a)(1)(A)

("Count I"); (2) false records in violation of 31 U.S.C. § 3729(a)(1)(B) ("Count II");

(3) conspiracy to defraud the Government in violation of 31 U.S.C. § 3729(a)(1)(c)

("Count  III"); and (4) use of false records to avoid or decrease a monetary obligation to

the Government in violation of 31 U.S.C. § 3729(a)(1)(G) ("Count IV").  (Am. Compl.

¶¶ 33-44.)  With respect to all four counts, Relators' primary contention is that

Defendants violated the FCA by submitting Medicare claims while failing to comply with

various Medicare requirements.  (*See generally id.*)  To this end, Relators assert multiple

theories of liability, involving a variety of statutes and regulations.[5]  (*See generally id.*)

---

[3]     During Phase I, Relators alleged that Relator Johnson worked in the Hillcrest facility's Wellness Center where she participated in and observed others participating in allegedly fraudulent conduct in that room.  (Am. Comp. ¶¶ 11-13.)

[4]     Relators alleged "upon information and belief" that Defendants' misconduct in the Hillcrest facility Wellness Center was part of a similar pattern and practice that occurred in approximately 324 other skilled nursing facilities across the country and eight other skilled nursing facilities in Minnesota.  (*Id*. ¶ 31.)

[5]     In its Phase I Order, the Court referred to the theories as:  (1) "scope-of-license" (therapy assistants acted outside their scope-of-license, i.e., physical therapy assistants

On March 14, 2016, Defendants moved for summary judgment on Phase I. (Doc. No. 257.)  The Court granted Defendants' motion insofar as it dismissed Relators' claims based on their documentation (other than allegations related to documentation of supervision of therapy services provided in the Wellness Center), timekeeping, and certification theories.  (Phase I Order at 53-55.)  Defendants now move for summary judgment on Relators' remaining claims and theories for Phase II:  (1) scope-of-license; (2) skilled services; (3) supervision; (4) group therapy; (5) claims against certain Defendants and conspiracy (Count III); and, (6) reverse FCA allegations (Count IV).[6] (Doc. No. 486.)  Defendants also move for attorney fees with respect to Relators' nationwide Phase II claims.  (Doc. No. 477.)

---

("PTAs") provided a service billed as occupational therapy, and certified occupational therapy assistants ("COTAs") provided a service billed as physical therapy); (2) "supervision" (failing to ensure proper supervision of therapy assistants and failing to document supervision); (3) "documentation" (failing to properly document therapy provided); (4) "group therapy" (assistants provided group therapy that was billed as individual therapy); (5) "skilled services" (mischaracterizing the monitoring of exercises performed by residents as provision of skilled services); (6) "no-therapy" (billing for therapy that Defendants did not in fact provide); (7) "timekeeping" (failing to accurately track and record the time that patients received services); and (8) "certification" (submitting services for claims under Medicare Part B for services provided to patients with no physician-certified Plan of Care in their medical record).  (Phase I Order at 13, 18, 23, 27, 31, 35, 38-39.)

[6]     Defendants also move for summary judgment with respect to Relators' claims related to the "no therapy" theory.  (Def. Memo. at 38.)  Because this theory was not limited to services provided in the Hillcrest facility Wellness Center, the Court dismisses those claims and denies Defendants' motion as moot.

**DISCUSSION**

## I.    Summary Judgment

As a preliminary matter, Defendants contend that Relators' Phase II claims fail

because Relators have no evidence beyond impermissible and unsupported speculation to

support their theories of liability.  Defendants contend that unlike Phase I, Relator

Johnson did not personally participate or observe others participating in allegedly

fraudulent conduct in the Wellness Center during Phase II.  (*See* Def. Memo. at 1-3.)

Notwithstanding, Defendants argue that Relators "elected not to pursue Phase II

discovery" as to the Hillcrest facility.  (*Id.* at 3.)  Defendants assert that because Relators

noticed no depositions during Phase II related to who staffed the Wellness Center in any

month, how many patients typically used the Wellness Center on a month or quarterly

basis, who was responsible for supervising the therapists' daily activities monthly, what

the monthly scheduling process was for the Wellness Center or any other fact relevant to

their allegations, their claims are based on mere speculation and conjecture which cannot

defeat summary judgment.  (*See generally* Def. Memo.)  Defendants go so far as to claim

that "the fact that the case is not worth the Relators' time tends to indicate that it is not

worth the Court's or the jury's time either."  (Doc. No. 505 ("Reply") at 5.)

Relators note that the Court found sufficient evidence to support their theories of

liability with respect to Phase I and argue that there is sufficient evidence for a jury to

conclude that Defendants' alleged fraudulent conduct also occurred during the Phase II

time period.  (Doc. No. 500 ("Rel. Opp.") at 3.)  Relators argue that there is no evidence

that the manner in which Defendants operated the Wellness Center during Phase I

"magically became fraudulent on December 1, 2005 and magically stopped being fraudulent on March 30, 2007, as they were dates selected by the Court in order to phase discovery in the case."[7]  (Doc. No. 500 ("Rel. Opp.") at 3.)  To this end, Relators reference the Court's finding that Defendants' alleged improper conduct was not limited to Relator Johnson, and assert that the knowledge of multiple corroborating witnesses covers the breadth of the Phase II time period.[8]  (*Id.* at 4-6 (citing Phase I Order at 13-15, 18-21, 27-29, 31-33).)  Accordingly, Relators argue that jurors are entitled to apply their common sense to conclude that absent evidence of any change, the fraudulent conduct allegedly occurring during the Phase I time period was occurring before and after it as well.  (*Id.*)

After reviewing the testimony of witnesses that worked in the Wellness Center during both the Phase I and Phase II time periods, the Court finds that it is not limited to the Phase I time period.  Therefore, the Court finds that much of the evidence that precluded summary judgment during Phase I also applies to the Phase II time period and is very much worth the Court's time to address.  As discussed below, the Court finds that Relators have presented sufficient evidence to create genuine issues of material fact that

---

[7]     Relators argue that jurors are entitled to apply their common sense to conclude that absent any evidence of a change, because the fraudulent conduct was occurring during the Phase I period, it was occurring immediately before and after it was well. (Rel. Opp. at 3.)

[8]     Relators assert that no additional depositions were necessary during Phase II because the Phase I testimony of assistants who also worked in the Wellness Center during Phase II was sufficient to establish that Defendants' wrongful conduct was not limited to the Phase I time period.  (*Id.* at 6-7.)

preclude summary judgment.  Notwithstanding, the Court observes that prevailing at the summary judgment phase is not tantamount to prevailing at trial where the standard is much higher.

Before addressing Relators' remaining theories and claims, the Court revisits the requirements to sustain a claim under the FCA.

### A.    The False Claims Act

Under the FCA's *qui tam* provisions, relators—private citizens acting as whistleblowers—may sue on behalf of the Government to recover damages for submission to the Government of materially false claims for payment.  31 U.S.C. §§ 3729, 3730; *see, e.g.*, *United States ex rel. Donegan v. Anesthesia Assocs. of Kan. City, PC*, 833 F.3d 874, 876 (8th Cir. 2016).  "The FCA attaches liability, not to the underlying fraudulent activity, but to the claim for payment." *U. S. ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 414 (8th Cir. 2012) (quoting *U.S. ex rel. Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998)).  As such, a viable FCA claim generally requires a relator to establish that the defendant presented a claim for payment to the Government, that the claim was false or fraudulent, and that the defendant knew the claim was false or fraudulent.  *U.S. ex rel. Simpson v. Bayer Healthcare (In re Baycol Prods. Litig.)*, 732 F.3d 869, 875 (8th Cir. 2013).  In addition, an FCA violation requires proof that a false or fraudulent claim or statement was material to the Government's decision to pay a claim.  *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016); *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 797 (8th Cir. 2011).

The FCA defines "knowing" as having "actual knowledge" or acting "in deliberate ignorance of" or "reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  It does not require "proof of specific intent to defraud."  *Id.* at § 3729(b)(1)(B).  As in this case, an FCA claim may arise when a defendant certifies compliance with statutory, regulatory, or contractual requirements but allegedly does not comply with such requirements.  *See, e.g.*, *Escobar*, 136 S. Ct. at 1995-96; *Donegan*, 833 F.3d at 876-77; *U.S. ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 827 (8th Cir. 2013).  A defendant does *not* knowingly present a false claim when:  (1) the requirement at issue is "ambiguous"; (2) the defendant acted pursuant to an "objectively reasonable" interpretation of the requirement; and (3) no formal government guidance warned the defendant away from its interpretation of the requirement.  *Donegan*, 833 F.3d at 878-79; *see also U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-91 (D.C. Cir. 2015) (applying the interpretation of "reckless disregard" established in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 (2007)); *Ketroser*, 729 F.3d at 832 ("[Defendant's] reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud under the FCA.").

The FCA also imposes a materiality requirement:  "[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be *material* to the Government's payment decision in order to be actionable under the [FCA]."  *Escobar*, 136 S. Ct. at 2002 (emphasis added).  The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

The Supreme Court clarified that FCA liability is not limited to violations of statutory, regulatory, or contractual requirements that the Government labels as "conditions of payment," as opposed to "conditions of participation." *Escobar*, 136 S. Ct. at 2001-04.  In the words of the Supreme Court, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive" of the materiality inquiry. *Id.* at 2003.  In addition to the Government's identification of a provision, courts should consider, without limitation, the Government's practice in paying or rejecting claims involving the statutory, regulatory, or contractual violation at issue. *Id.* at 2003-04; *see also Onnen*, 688 F.3d at 414-15 (explaining that "whether a specific type of regulatory non-compliance resulted in a materially false claim for a specific government payment" is a "fact-intensive" and "often complex" question); *United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 962 (rejecting distinction between conditions of payment and conditions of participation as dispositive of materiality inquiry).

The Supreme Court also noted that a defendant's knowledge that the Government would be *entitled* to refuse payment if the Government were aware of a violation is, without more, insufficient to meet the materiality requirement. *Escobar*, 136 S. Ct. at 2004.  As the Supreme Court recognized, the materiality standard is "demanding," and the FCA is not "a vehicle for punishing garden-variety . . . regulatory violations." *Id.* at 2003.

## B.      Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574

F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive

determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)

(quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna

Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate

the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v.

Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment "may not rest upon mere allegation or denials

of his pleading, but must set forth specific facts showing that there is a genuine issue for

trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## C.      Scope-of-License Theory

Defendants argue that Relators' scope-of-license fails because Relators cannot

establish FCA falsity and knowledge.  (Doc. No. 488 ("Def. Memo.") at 11.)  Defendants

contend that "Relators do not allege a single claim in which any therapist assistant acted

10

outside the scope of his or her license in the Wellness [Center], and, indeed, did not

conduct any discovery to learn whether that practice occurred related to Phase II." (*Id.*)

Defendants cite declarations from two individuals to argue that it is undisputed that no

therapy assistant acted outside of his or her scope-of-license. (*Id.* at 11 (citing Doc.

Nos. 494 ("Quinnell Decl.") ¶ 6; Doc. No. 495 ("Cavanaugh Decl.") ¶¶ 6-7).)

Defendants assert that "because there is no false claim, there is not an FCA violation as a

matter of law." (*Id.*) Defendants argue further that even if an isolated event did occur

during Phase II, Relators have no evidence that the occurrence was anything more than a

random event. (*Id.*) Defendants argue that because speculation is insufficient to create a

fact question, Relators' Phase II allegations should be dismissed. (*Id.*)

Relators first assert that two declarations do not make an assertion

"undisputable."[9] (Rel. Opp. at 7.) Moreover, Relators contend that the evidence

establishes that the standard practice in the Wellness Center was that "at the end of each

day, senior [Wellness Center] assistants would divide the patients seen between the

[Wellness Center] PTA and COTA, irrespective of who had worked with the patient, in

order to equalize the amounts billed by the assistants, and thus their productivity."

(*Id.* (citing Doc. No. 250 ("Um'rani Decl.") ¶¶ 3, 22, Ex. 3 ("Johnson Dep") at 176-77,

Ex. 22 ("Quinnell Dep.") at 25-30, 90-91).) Relators observe that the Court considered

this evidence when it denied Defendants' Phase I motion for summary judgment and

contend that the same evidence reflects that the billing practice was systemic and

---

[9]      Relators also contest the completeness of the declarations. (Rel. Opp. at 6.)

continued throughout the Phase II time period.[10]  (Rel. Opp. 9 (citing Phase I Order at 14.)

The Court agrees that much of the same evidence that precluded summary judgment during Phase I also applies to Phase II.  While Defendants argue that Relators' claims are based on mere speculation because Relators did not conduct additional discovery with respect to Phase II, the Court disagrees.  Relators cite sufficient testimony from witnesses who worked in the Wellness Center during both the Phase I and Phase II time periods to create dispute over genuine issues of material fact regarding the scope-of-license theory.[11]  Moreover, there is no evidence that anything changed to alter the Court's Phase I analysis with respect to Phase II.  Taking the evidence in the light most favorable to Relators, as it must, the Court finds that there are genuine issues of material fact that preclude summary judgment with respect to the scope-of-license theory during the Phase II time period.

### D.    Skilled Services Theory

Defendants argue that the skilled services theory fails because Relators cannot establish FCA falsity beyond bald speculation.  (Def. Memo. at 14.)  Defendants argue

---

[10]    Relators cite the testimony of witnesses who worked in the Wellness Center during both the Phase I and Phase II time periods who stated that they worked outside the scope of their license.  (Rel. Opp. at 10 (citing Um'rani Decl. ¶¶ 6, 15, Ex. 6 ("Hodgin Dep.") at 20, 52, 59, 92, Ex. 15 ("Huynh Dep.") at 7, 18, 55, 63-66, 81-83).)

[11]    Having reviewed the testimony, the Court finds that it was not specific to the Phase I time period.  Because the witnesses worked in the Wellness Center during both the Phase I and Phase II time periods, the Court finds that a reasonable jury could conclude that the alleged misconduct occurred during both time periods.

that Relators cannot establish FCA falsity with respect to Phase II because they "cannot point to a single incident in which the services in the Wellness [Center] were unskilled." (Def. Memo. at 14-15.)  Defendants also contend that "there is not a single patient who received unskilled therapy."  (*Id.* at 15 (citing Doc. Nos. 256 ¶ 5, Ex. A ("Stearns Rep.") ¶¶ 41, 85; Doc. No. 495 ("Cavanaugh Decl.") ¶ 9).)

Defendants also claim that because their expert testified that "each service provided in the Wellness [Center] was skilled because for each patient's condition the services were 'so inherently complex that they can be safely and effectively performed only by, or under the supervision of, professional or technical personnel,'" Relators cannot establish that any of the claims related to the 647 patients identified by Relator's expert were objectively false.[12]  (*Id.* at 15 (citing 42 C.F.R. § 409.31; Doc. No. 256 ¶ 5, Ex. A ("Stearns Rep.") ¶¶ 41, 85).)

Defendants further contend that Relators' expert only reviewed 10 of the 647 patients who Relators claim received fraudulently unskilled services and he testified that those patients benefited from the provision of therapeutic exercise.  (*Id.*)  Accordingly, Defendants argue that there is no dispute over whether the services in the Wellness Center were in fact skilled.  (*Id.*)  Defendants argue further that even if there was such a reasonable argument between the experts, there would be no FCA liability as a matter of law.  (*Id.* at 15-16 (citing *United States v. AseraCare, Inc.,* 938 F.3d 1278, 1301 (11th

---

[12]     Defendants contend that Relators cannot dispute their expert's finding because "medical records compellingly demonstrate the skilled nature of the service, so Relators did not even depose Defendants' expert."  (Def. Memo. at 15.)

Cir. 2019) (affirming district court's ruling that the mere difference of reasonable opinion between physicians, without more, as to whether patient was qualified for hospice benefits does not constitute an objective falsehood); *Druding v. Care Alternatives*, 346 F. Supp. 3d 669, 688 (D.N.J. 2018) (same); *U.S. ex rel. Lawson v. Aegis Therapies, Inc*., No. 210-072, 2015 WL 1541491, at *11-12 (S.D. Ga. Mar. 31, 2015) (same); *see also U.S. ex rel. Wall v. Vista Hospice Care, Inc*., No. 3:07-cv-604, 2016 U.S. Dist. WL 3449833, at *16-18 (N.D. Tex. June 20, 2016) (same); *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1029, 1032-33 (D. Nev. 2006) (same).  Accordingly, Defendants argue that there is no triable issue of fact regarding whether the therapeutic services in the Wellness Center were skilled.  (Def. Memo. at 16.)

Relators point out that the Court considered and rejected nearly the same arguments with respect to Phase I.  (Rel. Opp. at 17 (citing Phase I Order at 33-35); *see also* Doc. No. 237 at 14-20.)  As they did with respect to Phase I, Relators re-assert that the dispute is not over whether patients were in need of skilled services, but rather whether Defendants provided those skilled services.  (*Id.* at 17-18.)  Relators argue that because Defendants' only support of their "broad assertion" that no patient received unskilled therapy is based on the declaration of a single assistant and on the report of Defendants' expert, there is insufficient evidence to make that assertion indisputable.

(Rel. Opp. at 18.)  At most, Relators argue, the declaration and report create a factual dispute.[13]  (*Id.*)  The Court agrees.

The Court once again finds that much of the same evidence that precluded summary judgment during Phase I also applies to Phase II.[14]  The Court finds no reason to depart from its Phase I analysis and conclusion that genuine issues of material fact also preclude summary judgment with respect to the skilled services theory during the Phase II time period.

### E.   Supervision Theory

Defendants argue that the supervision theory fails because Relators cannot establish FCA falsity, knowledge, or materiality with respect to Phase II because whatever support Relators claim exists is purely speculative.  (Def. Memo. at 16.)

### 1.   Falsity

Defendants first argue that Relators cannot establish Falsity because:  (1) Relators cannot identify any patient who received services from a COTA who did not collaborate face-to-face with an occupational therapist every two weeks or from a PTA who was not observed by a physical therapist every sixth visit with that patient in the Wellness Center and the undisputed evidence shows that Defendants complied with state and federal

---

[13]     Relators cite to multiple instances covering both the Phase I and Phase II time periods where the services provided in the Wellness Center were not skilled.   (Rel. Opp. at 14-17.)

[14]     The Court incorporates by reference its Phase I analysis.  (*See* Phase I Order at 31-35.)

supervision;[15] and, (2) Relators' theory fails under *Escobar* because Defendants do not make specific representations about supervisory time when they submit their claim forms.[16]  (*Id.* at 17-18 (citing *Escobar*, 136 S. Ct. at 2001).)

Relators argue that there is sufficient evidence for a jury to find it more likely than not that the patients who received therapy in the Wellness Center during the Phase II period received it from assistants who were not properly supervised.  (*Id.* at 23-24.)  First, Relators contend that as with Phase I, Defendants did not produce anything that documents supervision in the Wellness Center by:  (1) occupational therapists of services provided by COTAs; or (2) physical therapists of services provided by PTAs during the Phase II period.  (Rel. Opp. at 20 (citing Doc. Nos. 502 ("Essling Decl.") ¶ 6; 489-1 ("Conners Decl.") ¶ 4, Ex. 1 ("Essling Discl.") ¶ 5).)  Relators also contend that the weekly summaries Defendants cite actually do not refer to observation of treatment or refer to services provided in the Wellness Center at all.  (*Id.*)

---

[15]     Defendants claim that during Phase II, PTAs and COTAs were supervised on an ongoing basis with daily observation, weekly meetings, and constant collaboration between therapists and assistants, and that therapists were "in the same building, on the same floor, and often in the same room with therapy assistants" to answer questions and provide supervision, and that this was properly documented in weekly summaries.  (Def. Memo. at 16 (citing Quinnell Decl. ¶ 5; Cavanaugh Decl. ¶ 6; Stearns Rep. ¶ 48).)  Defendants further allege that "even the 10 cherry-picked records" analyzed by Relators' expert, Elisa Bovee, "included clear examples of face-to-face collaboration (aside from the weekly in-person meeting and other documented interaction) and physical therapist observations of PTAs every six sessions."  (Def. Memo. at 17 n.8.)

[16]     In *Escobar*, the Supreme Court recognized an implied certification theory of falsity if the following conditions are met:  (1) the defendant's claim makes specific representations about the goods or services provided; and (2) the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.  (*Escobar*, 136 S. Ct. at 2001.)

Relators argue that because documentation of supervision is required and because there is no evidence of such documentation here, jurors would be entitled to apply their common sense to conclude that no supervision occurred.  (*Id.*)  Relators further contend that "the direct evidence overwhelmingly establishes that physical therapists and therapists failed to supervise patient treatment in the [Wellness Center]" because: (1) assistants were not trained by an appropriate therapist on how to provide skilled therapy on the machines in the Wellness Center; (2) there was little to no ongoing exchange of information between therapists and therapy assistants about patients' progress toward treatment goals in the Wellness Center; and (3) there was virtually none of the required in-person therapist supervision of care.[17]  (*Id.* at 20-22 (citing Hodgin Dep. at 31-35, 39-40, 46-47, 51, 61-63, 105-106; Quinnell Dep. at 23-24, 51, 55, 85; Huynh Dep. at 36-38.)

Relators also point out that the Court rejected Defendants' argument that the required supervision occurred at weekly meetings when therapists were available in a different room to answer questions because "Minnesota's statutory supervision requirements are unambiguous" and that "Minnesota clearly requires occupational and physical therapists to conduct or observe treatment procedures in-person as part of their supervision of therapy assistants; merely meeting to discuss patients is insufficient." (*Id.* at 23 (citing Phase I Order at 22).)

---

[17]    Relators further assert that the lack of supervision in the Wellness Center contrasted with the routine supervisory visits the occupational therapists had with COTAs in the occupational therapy gym.  (Rel. Opp. at 23 (citing Um'rani Decl. ¶ 14, Ex. 14 ("Janke Dep.") at 8-9, 26-27).)

With respect to Defendants' argument that their claims were not false because they did not make specific representations about supervisory time when they submitted their claim forms, Relators argue that representing to Medicare that therapy was provided without disclosing their noncompliance with the statutory requirements makes those representations misleading.  (*Id.* at 24.)

Once again, the Court finds no reason to depart from its Phase I analysis and conclusion.[18]  While Defendants now rely on *Escobar* to bolster their position, the Court finds that questions of fact still preclude summary judgment.  Although Defendants may not have specifically certified supervision minutes, the Court finds that a reasonable jury could conclude that failing to disclose noncompliance with statutory requirements nonetheless makes their representations misleading.

## 2.    Knowledge

Defendants next argue that Relators cannot establish FCA knowledge because they cannot point to a single incident during Phase II when any therapy assistant was not appropriately supervised and therefore cannot show that any false claim was submitted in deliberate ignorance or with reckless disregard.  (Def. Memo. at 19.)  Relators contend that the overwhelming evidence that supervision did not occur defeats Defendants' argument.

---

[18]    Defendants' arguments are largely the same as those the Court previously considered and rejected.  (*See* Phase I Order at 21-22).)  The Court incorporates by reference its Phase I analysis.  (*Id.*)

The Court finds no reason to depart from its Phase I analysis and conclusion; Relators have presented sufficient evidence from fact witnesses that worked in the Wellness Center during both Phase I and Phase II to support their claims and defeat summary judgment.[19]

### 3.     Materiality

Finally, Defendants argue that Relators cannot create a triable issue of fact regarding FCA materiality because any alleged infraction constituted nothing more than a breach of the Medicare and Medicaid programs conditions of participation as opposed to condition[s] of payment.[20]  (Def. Memo. at 19-21 (citing *Escobar*, 136 S. Ct. at 2002).) Specifically, Defendants contend that the supervision theory fails because the Government does not routinely deny or recoup payments made on claims based upon breaches of the supervision requirement.  (*Id.* at 22-28.)

First, Defendants argue that supervision requirements under both the plain language of 42 C.F.R Part 483 and case law are paradigmatic conditions of participation under which the government does not seek repayment of claims but pursues other

---

[19]     The Court incorporates by reference its Phase I analysis.  (*See* Phase I Order at 22-23)

[20]     The Supreme Court stated that to be actionable under the FCA, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision."  (*Escobar*, 136 S. Ct. at 2002.)  It explained that a "misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment."  *Id.*  It further clarified that if "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."  *Id.* 2003-04.

sanctions instead.  (*Id.* at 22-24.)  Defendants next argue that the only available evidence in Minnesota demonstrates that supervisory breaches are typically addressed through administrative sanctions such as oversight and education as opposed to recoupment of paid claims.  (*Id.* at 24-27.)

Defendants argue further that no repayments have been sought in this case.  (*Id.* at 27-28.)  Defendants contend that unlike Phase I, the Court did not have available the multiple circuit court rulings applying *Escobar* "to bar precisely actions like this where the government has known of the alleged false statements for years and has never denied any payment or claim."  (*Id.* at 27-28 (citing *U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663-65 (5th Cir. 2017); *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3rd Cir. 2017); *U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1033-34 (D.C. Cir. 2017); *U.S. ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 334 (9th Cir. 2017); *U.S. ex rel. Abbott v. BP Exploration & Prod.*, 851 F.3d 384, 387-88 (5th Cir. 2017); *U.S. ex rel. D'Agostino v. ev3, Inc.,* 845 F.3d 1, 8-9 (1st Cir. 2016).)

Therefore, Defendants argue that Relators' supervision claims should be dismissed because "Relators cannot assert a disputed material fact exhibiting that the government routinely addresses a breach of the supervisory rules by denying payment on claims or recouping payments made on claims, as opposed to other lesser sanctions."  (*Id.* at 28.)

Relators point out that the Court rejected nearly the same argument with respect to Phase I and argue that Defendants have provided no reason for the Court to reconsider its decision with respect to Phase II.  (Rel. Opp. at 24 (citing Phase I Order at 23).)

With respect to Defendants' argument that the supervision requirements are paradigmatic conditions of participation, Relators cite the Phase I Order which states that "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive of the materiality inquiry" and that "whether a specific type of regulatory non-compliance resulted in a materially false claim for a specific payment is a fact intensive and often complex inquiry." (*Id.* at 25-26 (citing Phase I Order at 11-12).)  Relators argue further that while the Government's continued payment of claims may be a factor in considering the materiality of the false claim, it is not dispositive.  (*Id.* at 26 (citing *Escobar*, 136 S. Ct. at 2003-04).)

Relators also contend that the Eighth Circuit rejected the argument that failure to comply with Minnesota's statutory supervision requirements cannot be pursued as FCA claims because they are typically addressed through administrative sanctions.[21]  (*Id.* at 27 (citing *Onnen*, 688 F.3d 410, 415).)  Relators argue further that the numerous disciplinary proceedings that Defendants cite show the materiality of Minnesota supervision requirements as opposed to immateriality.  (*Id.*)

Finally, Relators argue that Defendants' reliance on *Escobar* is misplaced because *Escobar* actually supports the materiality of the supervision requirements.[22]  (*Id.* at 27-28

---

[21]    The Eighth Circuit stated, "Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud." *Onnen*, 688 F.3d. at 415.

[22]    The Supreme Court explained that a matter is material "if a reasonable man would attach importance to it in determining his choice of action in the transaction" or "if the defendant knew or had reason to know that the recipient of the representation attaches

(citing *Escobar,* 136 S.Ct. at 2001-2004).)  Relators contend that Medicare attached

importance to certain certifications Defendants submitted with their claims for payment,

and that payment may not have been made in absence of those certifications.  (*Id.* at 28

(citing Doc. No. 501, Ex. D ("Bovee Dep.") at 99-101).)  Relators argue that because

Defendants did not actually provide the appropriate and quality care that they certified,

the Government did not get what it bargained for when it agreed to pay Defendants.

The Court once again rejects Defendants' argument regarding conditions of

payment and conditions of participation.[23]  (*See* Phase I Order at 23.)  Moreover, the

Court reiterates that while the Government's continued payment of claims is a factor in

considering the materiality of the false claim, it is not dispositive.  (*See id* at 11-12 (citing

*Escobar*, 136 S. Ct. at 2003-2004).)  While other Courts working with different sets of

facts and circumstances have reached other conclusions, the Court declines to rule as a

matter of law that the Government's continued payment, or any other single factor, is

dispositive in this fact-intensive and complex inquiry.

In short, the Court finds that genuine issues of fact preclude summary judgment

with respect to the supervision theory during the Phase II period.

---

importance to the specific matter in determining his choice of action, even though a
reasonable person would not."  *Escobar,* 136 S. Ct. at 2002-2003.

[23]     The Court incorporates by reference its Phase I analysis.  (*See* Phase I Order
at 23.)

### F.     Group Theory

Defendants argue that Relators' group therapy allegations fail because they cannot

establish FCA falsity or knowledge.  Specifically, Defendants argue that Relators cannot

establish FCA falsity because "they cannot point to a single individual who received

group therapy" during the Phase II period.  (Def. Memo. at 28.)  Defendants contend that

during Phase II, therapist assistants who treated residents in the Wellness Center provided

specific instructions and treatment which they believed were consistent with Medicare

and Medicaid regulations.  (*Id.* at 28-29 (citing Cavanaugh Decl. ¶¶ 8-9).)

Even assuming that more than one resident occupied the Wellness Center at any

point during Phase II, Defendants argue that Relators cannot demonstrate that Defendants

acted with reckless disregard or deliberate ignorance because they believed that they were

performing concurrent therapy.[24]  (Def. Memo. at 29.)

Relators contend that a single declaration does not make a fact indisputable, and

that there is considerable evidence that much of the claimed therapy in the Wellness

Center was in a group setting of two assistants monitoring four patients.  (Rel. Opp. at 12

(citing Um'rani Decl. ¶ 11, Ex. 11 ("Derhaag Dep.") at 16); Hodgin Dep. at 47-48).)[25]

Relators also contend that therapy services provided in a concurrent model usually do not

qualify as skilled services under Medicare and that there is nothing in any patient's

---

[24]     Defendants argue that there is no proof that more than one resident occupied the
Wellness Center at any point during Phase II.  (Def. Memo. at 29.)

[25]     Derhaag and Hodgin both worked primarily in the Wellness Center during both
the Phase I and Phase II time periods.  (*See* Rel. Opp. at 6.)

record, or elsewhere, suggesting that its use was one of the "isolated instances" in which it was appropriate. (*Id.* at 11-13 (citing Medicare Program; Prospective Payment System & Consolidated Billing for Skilled Nursing Facilities-Update, 66 Fed. Reg. at 23,984, 23992 (May 10, 2001); Doc. No. 287-1 ("Bove Rep.") at 68-69).)

Because much of the same evidence that precluded summary during Phase I also applies to Phase II, the Court finds no reason to depart from its Phase I analysis and conclusion.[26] Moreover, the Court agrees with Relators that a single declaration does not make a fact indisputable; at best, it creates a question of fact. Therefore, the Court finds that genuine issues of material fact preclude summary judgment with respect to the group therapy theory during the Phase II time period.

### G.    Claims against Certain Defendants and Conspiracy

Defendants briefly argue that Relators' allegations against Defendants Golden Gate National Senior Care, L.L.C. and GGNSC Holdings, L.L.C fail as a matter of law because Relators have no evidence that they caused the presentation of a knowingly false, material claim and "it is axiomatic that a corporate entity is not liable under the FCA merely because it is related to another corporate entity." (Def. Memo. at 30-31.)

Defendants also claim that because Relators' substantive FCA claims fail, their claim that Defendants violated the FCA's conspiracy provision also fails as a matter of law. (*Id.* at 31.) Defendants argue further that Relators' conspiracy claim should be dismissed because they allege a conspiracy among related corporate entities. (*Id.* at 32

---

[26]    The Court incorporates by reference its Phase I analysis. (*See* Phase I Order at 29-30.)

("because a conspiracy requires an agreement between two or more persons . . . the intra-corporate conspiracy doctrine provides that a corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation") (citing *U.S. ex rel. Woods v. SouthernCare, Inc.*, No. 3:09-CV-00313, 2013 U.S. Dist. LEXIS 46820, at *19 (S.D. Miss. Mar. 30, 2013)).)

Relators argue that Defendants Golden Gate National Senior Care, L.L.C. and GGNSC Holdings, L.L.C are a part of the self-described "Golden Living Family of companies" ("Golden Living entities") and are not entitled to summary judgment as a matter of law because the ownership, administration, billing, and financial interests of the Golden Living entities are united and each Defendant is liable for its role in the alleged fraudulent billing.  (Rel. Opp. at 31-32.)

Relators argue further that because Defendants are not entitled to summary judgment on their substantive FCA claims, their conspiracy claim survives.  Relators also contend that while some courts have applied the intra-conspiracy doctrine to FCA cases, the doctrine developed within the context of antitrust law and should be limited to those cases. (*Id.* 32-33 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001); *States ex rel. Millin v. Krause*, Civ. No. 1:17-01019, 2018 U.S. Dist. WL 1885672, *12 (D. S.D. April 19, 2018); *U.S. ex rel. Harris v. Lockheed Martin Corp.*, 905 F. Supp.2d 1343(N.D. Ga. 2012); *U.S. v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151, 199 (D. Mass. 2004).

The Court finds that neither party has fully briefed these issues; therefore, the Court cannot conclude as a matter of law whether dismissal of Relators' allegations

against Defendants Golden Gate National Senior Care, L.L.C. and GGNSC Holdings, L.L.C, is appropriate, or whether Relators' conspiracy claim survives summary judgment. It is unclear precisely what the relationship is between the related entities, or how the conspiracy charge affects the ultimate outcome of this litigation.  Accordingly, the Court requires additional briefing on these issues.

### H.    Reverse FCA Claim Allegations (Count IV)

In Count IV, Relators allege that Defendants made or used false records to avoid or decrease a monetary obligation to the Government in violation of 31 U.S.C. § 3729(a)(1)(G), the so-called reverse-false-claims provision of the FCA.  (Am. Compl. ¶¶ 42-44.)  Defendants argue that because Relators' reverse-false-claim allegations are raised interchangeably with their substantive FCA allegations, their reverse false claims also fail because there is no record evidence to support them.  (Def. Memo. at 32-32.) Relators contend that because Defendants are not entitled to summary judgment on Relators' substantive FCA claims, Defendants are not entitled to summary judgment on Relators' reverse false claim count.  In their Reply, Defendants argue that because Relators' opposition did not raise specific facts that Defendants "knowingly and improperly" retained an overpayment in their opposition, it is proof that no such evidence exists.  (Reply at 12.)

As discussed above, the Court finds that Relators' substantive FCA allegations survive summary judgment.  While Relators opposition did not include specific facts that Defendants knowingly and improperly retained an overpayment, the Court still finds that

there is a sufficient factual dispute to preclude summary judgment with respect to Relators' reverse-FCA claim allegations.

While the Court finds that Relators' claims survive, the Court again notes that prevailing at the summary judgment phase is not tantamount to prevailing at trial. Indeed, while genuine issues of material fact prevent summary judgment, Relators face a much higher standard to prevail at trial.

## II.    Motion for Attorney Fees

Defendants move the court for attorney fees, expenses, and costs with respect to Relators' now dropped nationwide claims.[27]

The FCA permits a successful defendant to recover its reasonable attorney fees, expenses, and costs if "the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment."  31 U.S.C. § 3730(d)(4).  The Eighth Circuit explained that "[t]he legislative history suggests, quite logically, that in determining whether to award attorney's fees under the FCA, courts should apply the familiar standards applied under  42 U.S.C. § 1988."  *Onnen*, 688 F.3d at 415.

Under Section § 1988, fee awards are appropriate only when a "plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in

---

[27]    As discussed above, Relators initially alleged "on information and belief" that Defendants' submission of false claims in connection with the Hillcrest facility Wellness Center was part of a nationwide practice of submitting false claims involving approximately 324 other facilities.  (*See* Am. Compl. § 31.)  The claims were subsequently limited to just the Hillcrest facility.  (Doc. Nos. 337, 378, 396, 420, 432.)

subjective bad faith." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421 (1978).

The Supreme Court cautioned that:

> It is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success . . . [N]o matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial.

*Id.* at 422. This is "a difficult standard to meet, to the point that rarely will a case be sufficiently frivolous to justify imposing attorney fees on the plaintiff." *Grynberg*, 389 F.3d at 1059.

Defendants contend that they are entitled to fees because they prevailed on Relators' nationwide claims, and because those claims were frivolous, overwhelmingly burdensome, and brought primarily to harass them. (Doc. Nos. 479 ("Def. Fee Memo.") at 2; 504 ("Def. Fee Reply") at 3.) Specifically, Defendants contend that Relators' nationwide allegations arose from an uncorroborated "bare-bones" allegation that they used "to inflict maximum burden on Defendants in the form of onerous Phase II discovery requests that caused Defendants to incur substantial fees and costs." (Def. Fee. Memo. at 1-2.) Defendants argue that Relators only "abandoned" their claims after being required to incur some of the discovery costs themselves. (*Id.* at 2.)

Defendants assert that because "Relators abandoned their nationwide, non-Hillcrest claims, [ ] there is no legitimate dispute that Defendants have prevailed on those claims." (Def. Fee Memo. at 4.) Defendants also contend that "Relators' wholesale

failure to identify specific allegedly false claims and their abandonment of the nationwide

claims as soon as costs shifted to them" shows that the claims had no chance of success

and were clearly frivolous.[28]  (*Id.* at 5-6.)  Defendants argue further that "Relators' failure

to pursue the nationwide Phase II claims [ ] can only be explained by Relators' desire to

harass Defendants by causing them to incur significant attorney fees and costs in

discovery."[29]  (*Id.* at 6.)  Finally, Defendants argue that Relators' claims were vexatious

because they did "violence to the purposes underlying the FCA."  (*Id.*)  To this end,

Defendants allege that Relators distorted the intent of the legislation by using the private

enforcement mechanisms of the FCA for improper purposes.  (*Id.* at 7.)

Relators argue that fee-shifting is not appropriate because Defendants did not

prevail on their nationwide claims and because the nationwide claims were factually

based.  (Doc. No. 498 ("Rel. Fee Opp.") at 2-5.)  Relators also contend that they

consistently took steps to minimize the burden of the non-Hillcrest discovery.  (*Id.*

at 4- 6.)  Relators assert that they ultimately dropped the nationwide claims because after

ten years of litigation, the non-Hillcrest discovery was insufficiently detailed to pursue

---

[28]     Defendants claim that Relators' nationwide claims "were uncorroborated at the time Realtors amended their complaint and remained so up to the day Relators forfeited them."  (Def. Fee Reply at 3.)

[29]     Defendants contend that they incurred approximately $770,000 in attorney fees and costs related to the nationwide Phase II claims.  (Def. Fee Opp. at 6 (citing Doc. No. 480 ¶ 8).)  Moreover, they contend that "they released 958,901 documents into a reading room that allowed Relators to identify documents for production."  (*Id.*)

the nationwide claims and they did not wish for the case to be further delayed by seeking additional discovery.[30]  (*Id.* at 6.)

Relators argue that "to be a prevailing party, there must be some 'judicially sanctioned change in the relationship of the parties.'"  (Doc. No. 498 ("Rel. Fee Opp.") at 7 (quoting *United States v. $32,820.56 in United States Currency*, 838 F.3d 930, 935 (8th Cir. 2016).)  Relators argue further that while a judgment on the merits or a court-ordered consent decree satisfies this requirement, "a voluntary change in conduct, although perhaps accomplishing what the other party sought" such as here, does not.[31] (*Id.*)  Notwithstanding, Relators contend that it is premature to determine whether fees should be awarded because this case is still ongoing.  (*Id.* at 8-9 (citing *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1059 (10th Cir. 2004).)

Relators argue that even if Defendants had prevailed on the nationwide claims, "they have not met the stringent standard under Section 3730(d)(4)" to warrant fee-shifting.  (*Id.* at 8.)  Relators contend that fees are warranted when a successful defendant can "demonstrate that the plaintiff has misused his statutory privilege and distorted the intent of the legislation."  (*Id.* (citing *Grynberg*, 389 F.3d at 1058 n.22).)  Here, Relators

---

[30]    Relators maintain that their decision not to pursue the nationwide claims in no way constituted an admission that the treatments in the non-Hillcrest facilities were properly billed to Medicare.  (Rel. Fee Opp. at 6.)

[31]    Defendants counter-argue that Relators' own conduct precluded the judicial resolution they now assert is required.  (Def. Fee Reply at 4.)  Defendants also contend that "a favorable ruling on the merits is not a necessary predicate to find that a defendant has prevailed."  (*Id.* at 5 (citing *CRST Van Expedited Inc. v. E.E.O.C.*, 136 S. Ct. 1642, 1646 (2016).)

argue that the facts of the case do not support Defendants' assertion that Relators pursued the nationwide claims solely to harass or to overwhelmingly burden Defendants.  (*Id.* at 9.)  Relators reiterate that they worked with the Court to limit discovery and that Defendants ultimately produced just 4,636 pages of non-Hillcrest patient file documents.[32]  (*Id.* at 9-10.)  Moreover, Relators contend that their decision not to pursue the nationwide claims was based on Defendants' insufficient record-keeping which did not allow them to readily determine which claims they would be able to prove, and Relators' desire to move the case forward.  (*Id.* at 10.)  Relators argue that they "should be commended for the reasonableness of their staged discovery, and their taking into account what they ascertained in that discovery."  (*Id.*)

Even if the Court were to find that Defendants are a prevailing party on the nationwide claims, the Court finds that fees are not warranted because it cannot conclude that the claims were clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.  The Court finds that Relators' nationwide claims had sufficient support prior to discovery, and that Relators' decision to drop the claims after ascertaining from targeted discovery that the claims would require several more years to prove was not improper.  (*See* Doc. Nos. 258 ¶¶ 4, 8, Ex. A; 285 ¶¶ 17-18, 30, Ex. 12 at 10-14.)  "No matter how meritorious one's claim may appear at the outset, the course of

---

[32]     Defendants adamantly refute that Relators attempted to minimize the burden of discovery and maintain that it was vexatious, overly burdensome, and for the purpose to harass them.  (Def. Fee Reply at 10-16.)

31

litigation is rarely predictable.  Decisive facts may not emerge until discovery or trial."

*Christiansburg*, 434 U.S. at 422.

While the Court understands that Defendants feel exasperated after more than ten years of litigation, the record simply does not support their theory that Relators brought and pursued the nationwide claims solely to harass Defendants, or that they dropped the claims only after having to incur costs.  The Court also finds that while the discovery was substantial, it was not vexatious or overwhelmingly burdensome.  In short, the Court finds that the circumstances in this case do not clear the high standard necessary to warrant fee-shifting.  *Grynberg*, 389 F.3d at 1059 ("[R]arely will a case be sufficiently frivolous to justify imposing attorney fees on the plaintiff.").

## CONCLUSION

For the reasons stated above, the Court finds that Relators' claims arising from the Hillcrest facility Wellness Center during the Phase II period survive summary judgment. Notwithstanding, success at this stage does not necessarily correlate to success at trial where the standard to prevail is much higher.  Moreover, the Court requires additional briefing related to the relationship among Defendants and how the conspiracy count affects the ultimate outcome of this litigation before the Court makes a decision on this issue.  The Court also denies Defendants' motion for attorney fees.

## ORDER

Accordingly, based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion for Summary Judgment (Doc. No. [486]) is **DENIED** as follows:

     a.      Relators' claims related to the no-therapy theory are **DISMISSED AS MOOT**.  Therefore, Defendants' motion for summary judgment on these claims is **DENIED AS MOOT**.

     b.      The Court requires additional briefing with respect to the relationship among Defendants, and how the conspiracy count affects the ultimate outcome of this litigation.  Defendants may submit a letter brief up to five pages on these issues no later than 15 days from the date of this Order.  Relators may submit a letter brief up to five pages in response no later than 15 days from the filing of Defendants' brief, or 30 days from the date of this Order, whichever is earlier.

     c.      Defendants' motion is otherwise respectfully **DENIED**.

2.      Defendants' Motion for Attorney Fees (Doc. No. [477]) is respectfully **DENIED**.

Dated:  April 20, 2020              s/Donovan W. Frank
                                    DONOVAN W. FRANK
                                    United States District Judge