UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, ex rel., Ricia Johnson, and Health Dimensions Rehabilitation, Inc., | Civil No. 08-1194 (DWF/HB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Golden Gate National Senior Care, L.L.C.; GGNSC Holdings, L.L.C; and GGNSC Wayzata, L.L.C.; all doing business as Golden LivingCenter – Hillcrest of Wayzata; and Aegis Therapies, Inc., | |
| Defendants. | |

Jonathan M. Bye, Esq., Ballard Spahr LLP; Lariss Maldonado, Esq., Stinson LLP; and W. Anders Folk, Assistant United States Attorney, United States Attorney's Office, counsel for Plaintiffs Ricia Johnson and Health Dimensions Rehabilitation, Inc.

Amy Slusser Conners, Esq., Jennifer L. Olson, Esq., and Thomas Backer Heffelfinger, Esq., Best & Flanagan LLP; James D. Kremer, Esq., DeWitt Mackall Crouse & Moore S.C.; Robert Salcido, Esq., Akin Gump Strauss Hauer & Feld LLP; and Kevin D. Hofman, Esq., Messerlie & Kramer P.A., counsel for Defendants.

Chad A. Blumenfield and Pamela Marentette, Assistant United States Attorneys, United States Attorney's Office, and Jonathan M. Bye, Esq., Ballard Spahr LLP, counsel for United States of America.

**INTRODUCTION**

This matter is before the Court on Defendants' Motion to Strike Mark Essling's

Expert Report (Doc. No. 466), and Motion to Exclude Expert Testimony of Mark Essling

and Elisa Bovee (Doc. No. 483).  For the reasons set forth below, the Court denies Defendants' motions.

## BACKGROUND

The factual background for the above-entitled matter is clearly and precisely set forth in the Court's December 9, 2016 Memorandum Opinion and Order and is incorporated by reference here.[1]  (*See* Doc. No. 324 ("Phase I Order").)  In short, this *qui tam* action was filed in 2008.  Relators Ricia Johnson ("Johnson") and Health Dimensions Rehabilitation, Inc. ("HDR") (collectively, "Relators") allege that Defendants Golden Gate National Senior Care, L.L.C., GGNSC Holdings, L.L.C, GGNSC Wayzata, L.L.C., and Aegis Therapies, Inc. ("Defendants") violated the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), by submitting false Medicare claims in connection with Defendants' provision of physical and occupational therapy services to nursing home patients.

Relators' complaint distinguishes between two different time periods. (Doc. No. 178 ("Am. Compl.") ¶¶ 30-31.)  As a result, the Court divided the case into two phases.[2]  (Doc. No. 115.)  Phase I focused on a single facility (the "Hillcrest facility")

---

[1]  The Court supplements the facts as necessary.

[2]  Discovery was phased such that Phase II would occur only if Relators' claims survived summary judgment as to Phase I.  As discussed below, the Court granted in part and denied in part Defendants' motion for summary judgment with respect to Phase I. (*See generally* Phase I Order.)

2

from December 2005 through March 2007.  (*Id.*)[3]  Phase II, currently before the Court, originally focused on nationwide allegations on dates outside of the Phase I time period.[4] Phase II was further phased and ultimately limited to just the Hillcrest Facility from May 2002 through November 2005 and April 2007 through March 2012.  (Doc. Nos. 337, 378, 396, 420, 432.)

Defendants now move to strike the expert report of Relators' expert, Mark Essling ("Essling"), and to exclude the testimony of Relators' experts Essling and Elisa Bovee ("Bovee").[5]

## DISCUSSION

### I. Motion to Strike Essling's Report

Defendants move to strike Essling's expert report (Doc. No. 489 ("Connors Decl.") ¶ 4, Ex. 1 ("Essling Rep.") ¶1) on the grounds that:  (1) it relies on information that was not timely disclosed during fact discovery; and (2) the damages Essling identifies were not provided in Relators' Rule 26 disclosures.  (Doc. No. 468 ("Strike Memo.") at 6-11.) Relators oppose the motion and ask that Defendants be ordered to pay

---

[3]   During Phase I, Relators alleged that Relator Johnson worked in the Hillcrest facility's Wellness Center where she participated in and observed others participating in allegedly fraudulent conduct.  (Am. Compl. ¶¶ 11-13.)

[4]   Relators alleged "upon information and belief" that Defendants misconduct in the Hillcrest facility Wellness Center was part of a similar pattern and practice that occurred in approximately 324 other skilled nursing facilities across the country and eight other skilled nursing facilities in Minnesota.  (*Id.* ¶ 31.)

[5]   Defendants have also moved for summary judgment on all of the Phase II claims; however, the Court addresses that motion in a separate order.  (*See* Doc. No. 514 ("SJ Order").)

3

Relators' costs and fees in responding to a baseless motion.[6] (Doc. No. 472 ("Strike Opp.") at 2.)

As a preliminary matter, the record reflects that on June 28, 2019, the parties agreed to a pretrial schedule which provided for completion of fact discovery and identification of expert witnesses on or before August 30, 2019, and the disclosure of Relators' experts' opinions by October 15, 2019. (Doc. No. 456.) These dates were incorporated into the Court's Order Amending Pretrial Scheduling Order (Phase II). (Doc. No. 458 ("Am. Scheduling Order").) On September 12, 2019, Defendants agreed to amend the Am. Scheduling Order by adding a December 13, 2019 deadline for completion of expert depositions.[7] (Doc. No. 463.) The record also reflects that Relators complied with these deadlines. (Doc. No. 473 ¶ 3.)

Defendants first argue that Relators should have disclosed the specific alleged false claims cited in Essling's report prior to the close of fact discovery. (Strike Memo at 6-7.) Defendants contend that "[the] untimely disclosure of the basic factual allegations underlying Paragraph 31 of the Amended Complaint completely disregards one of the primary purposes of civil discovery, which is to "eliminate unfair surprise."[8]

---

[6] While the Court denies Defendants' Motion to Strike, the Court declines to award attorney fees or costs at this time.

[7] The Court adopted this amendment on September 13, 2019. (Doc. No. 464.)

[8] The Court observes that it has already considered and rejected variations of the argument that Relators should have specifically identified the alleged false claims in their Complaint or Amended Complaint. (*See, e.g.*, Doc. Nos. 54 (denying Defendants' motion to dismiss Complaint); 199 (overruling Defendants' objections order granting Relators leave to amend Complaint and denying Defendants' motion to dismiss Amended

4

(*Id.* at 7 (citing *Doe v. Young*, 664 F.3d 727, 734 (8th Cir. 2011)).) Defendants argue further that "given the scope of potential patients at issue, there is no way Defendants could have predicted which patients Relators' claims would be based in order to prepare their defense." (*Id.* at 7.) Defendants contend that the late disclosure significantly prejudices them because they were unable to depose those with knowledge of the alleged false claims. (*Id.*)

Defendants also contend that Essling's opinions should be stricken because Relators failed to comply with Rule 26 of the Federal Rules of Civil Procedure when they neglected to timely provide their damages computation and that Essling's opinions are no substitute for compliance with Rule 26's requirements.[9] (*Id.* at 7-11.) Defendants argue that allowing Essling's opinions is akin to "trial by ambush" because they did not have the opportunity to conduct fact discovery with respect to any of the alleged claims Essling identified. (*Id.* at 10.)

Relators cite the Am. Scheduling Order to argue that the Essling Report was timely disclosed. (Strike Opp. at 2-3.) Relators argue further that Defendants have not suffered prejudice for three reasons: (1) the sequencing for fact and expert discovery for the Phase II period was identical to the Phase I period so if Defendants wanted the

---

Complaint); Phase I Order (denying Defendants' motion for summary judgment).) As discussed herein, the Court again rejects this argument.

[9]   Rule 26(e)(2) requires that Rule 26 disclosures and other written discovery responses must be supplemented if a party learns the response is incomplete "and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

5

schedule for Phase II to provide for the disclosure of expert opinions before the conclusion of fact discovery, Defendants could have proposed it in lieu of the Am. Scheduling Order that they did propose; (2) Defendants could have raised their concern at any of the numerous Case Management Conferences over the last two years, including those where the pretrial schedule was explicitly addressed; and (3) Defendants have known all along the identity of the assistants with knowledge of the Hillcrest claims during the Phase II period and could have chosen to depose them prior to the Phase II discovery cut-off.  (Strike Opp. at 4-6.)  Moreover, Relators contend that any argument that they failed to comport with Rule 26 fails because Essling's opinions were timely disclosed and addressed issues that have been in the case since the outset.  (*Id.* at 3, 5.)

The Court agrees.  Because Essling's opinions were timely disclosed during the discovery process in a schedule Defendants agreed to and because his opinions addressed issues that have been in the case since the outset, the Court finds no basis to exclude his expert report on the basis of prejudice, "unfair surprise", "trial by ambush", or any other reason.

## II.     Motion to Exclude Plaintiffs' Experts

Defendants also move to exclude the expert testimony of Relators' experts, Essling and Bovee.[10]  (Doc. No. 483.)

---

[10]    Defendants also moved to exclude the expert testimony of Essling and Bovee during Phase I.  (Doc. No. 260.)  The court held that both Essling and Bovee's testimony was admissible with respect to the Phase I time period.  (Phase I Order at 55.)

### A.     Legal Standard

Before accepting the testimony of an expert witness, the trial court is charged with the "gatekeeper" function of determining whether an opinion is both relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 820 (D. Minn. 2011). The Eighth Circuit extended the *Daubert* holding to apply to non-scientific experts qualified by their experience, education, skill, or expertise in their field.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

A duly qualified expert may testify if:  (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful."  *Daubert*, 509 U.S. at 591 (internal quotation marks and citation omitted). Finally, expert testimony is appropriate when "it relates to issues that are beyond the ken of people of ordinary experience."  *U.S. v. Clapp,* 46 F.3d 795, 802 (8th Cir.1995) (internal quotation marks and citation omitted).  "Where the subject matter is within the knowledge or experience of laymen, expert testimony is superfluous."  *Id.*

In determining whether the proposed expert testimony is reliable, the Court can consider:  (1) whether the theory or technique can be and has been tested; (2) whether the

theory or technique has been subjected to peer review and publication; (3) the known rate of potential error; and (4) whether the theory has been generally accepted. *Id.* at 593-94. The purpose of these requirements "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co.,* 526 U.S. at 152.

In *Kuhmo Tire,* the Supreme Court determined, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." 526 U.S. at 152. In other words, a trial court should consider the specific factors identified in *Daubert* where there are reasonable measures of the reliability of expert testimony. *Id.* The objective of that requirement is to ensure the reliability and relevancy of expert testimony. *Id.*

The Court also notes that "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and it favors admissibility over exclusion. *Lauzon*, 270 F.3d at 686 (quoting *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir. 1999)). When examining an expert opinion, a court applies a general rule that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)). "[I]f the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury," then it must be excluded. *Id.* at 929-30.

### 1. Essling

Essling is the Chief Executive Officer and General Counsel of Relator HDR.[11] (Essling Rep. ¶ 1.) As a result of his duties at HDR, Essling is familiar with Medicare billing requirements and the types of files that nursing homes keep for patients receiving physical, occupational, or speech therapy that is paid for through Medicare. (*Id.* ¶ 3.) Essling or members of his staff reviewed relevant portions of the patient medical files produced by Defendants in Phase II of this action. (*Id.* ¶ 4.) In his review, "Essling did not see any documentation of supervision by occupational therapists of services provided by occupational therapy assistants in the [Wellness Center], or any documentation of supervision by physical therapists of assistants in the [Wellness Center]." (*Id.* ¶ 5.) Based on this observation, Essling identified 805 claims where Defendants allegedly represented to Medicare that Medicare eligible therapy was provided by one of seven therapy assistants who worked exclusively or primarily in the Wellness Center.[12] (*Id.* ¶¶ 6-7.) Defendants move to exclude Essling's testimony on the grounds that it is

---

[11] HDR is engaged in the business of providing physical therapy, occupational therapy, and speech therapy, much of which is paid for by Medicare. (Essling Rep. ¶ 2.) Essling has held the position of General Counsel since approximately 1995 and the position of Chief Executive Officer since approximately 2000. (*Id.* ¶ 1.)

[12] Essling opined that Medicare paid a total of $6,662, 613.65 for months during the Phase II period where the per diem rate per claim was based on therapy minutes. (Essling Discl. ¶ 7.)

9

speculative, and his methodology is unreliable.[13] (Doc. No. 485 ("Def. Memo.") 7-10, 13-19.)

Defendants first argue that Essling's testimony should be excluded because it is speculative and will not assist the jury. (*Id.* at 9-11, 20.) Specifically, Defendants contend that Essling's opinions "rest on an unreliable foundation based on an inference he drew from an incomplete record" and because Essling disregarded "undisputed evidence" that "undercuts the reliability of Essling's opinion that the [certified occupational therapy assistants] and [physical therapy assistants] were unsupervised" or that all therapy was provided in the Wellness Center.[14] (*Id.* at 10-11.) Defendants argue further that while they provided approximately 3,748 patient records, Essling "does not explain how he determined which patient files to review," and "made no attempt to determine whether the patient files he reviewed were even relevant to this case." (*Id.* at 1-2.)

Defendants next argue that Essling's testimony should be excluded because it is "not only unmoored from any rule or regulation, but it contradicts the methodology Essling used in Phase I." (*Id.* at 14.) Defendants contend that unlike Phase I where

---

[13] Defendants previously challenged Essling's qualifications; however, the Court found that he was qualified to offer testimony and that his qualifications go to his credibility as a witness rather than admissibility. (December 2016 Order at 45.)

[14] Defendants contend that Essling's reasoning was not properly applied to the facts at issue when there is "undisputed evidence" that the physical and occupational therapy assistants were properly supervised and because his calculations include non-Wellness Center therapy. (Def. Memo. at 9-11.) As discussed in its Order denying Defendants' motion for summary judgment and incorporated here by reference, the Court finds this argument unpersuasive. (*See* SJ Order.)

10

Essling calculated the government's alleged overpayments based on changes in a patient's Resource Utilization Group ("RUG") level and the difference in reimbursement between RUG levels, Essling included the entire reimbursement amount in his Phase II calculations. (*Id.*) Defendants assert that "there is no legal support for including the entire reimbursement amount in the damages calculation." (*Id.*)

Defendants argue further that Essling's calculations do not accurately reflect how skilled nursing facilities are paid under Medicare Part A. (*Id.* at 15-20.) Specifically, Defendants assert that Essling "ignores the way days are covered by rate assessments" and "includes payments for non-rehab RUG codes." (*Id.*)

Relators contend that Essling's calculations are properly supported because they are based on assistants' testimony and on Defendants' own representations as to which assistants were assigned exclusively or primarily to the Wellness Center.[15] (Doc. No. 499 ("Rel. Opp.") at 7.) Relators argue further that "while damages may not be based on speculation or guesswork, they may be based on a 'just and reasonable estimate of the damage based on relevant data.'"[16] (*Id.* (citing *Bigelow v. RKO Pictures, Ins.*, 327 U.S.

---

[15] Relators also assert that while they have no obligation to explain, Essling's calculations were limited to patients where Defendants produced the full set of documents needed to calculate damages. (Rel. Opp. at 6 n.1.)

[16] Realtors argue that "this lesser standard for proving the amount of damages derives from the principle that 'a wrongdoer should not profit from the harm occasioned by its act.'" (Rel. Opp. at 7 (citing *Nat'l Farmers' Org., Inc. v. Assoc. Milk Prod., Inc.*, 850 F.2d 1286, 1293 (8th Cir. 1988)).) Defendants contend that this principle does not "'suggest that a plaintiff is somehow relieved of its burden to make a reasonable estimate whenever it claims the defendant is a wrongdoer'" and that "Relators' proffered expert makes 'no effort, whatsoever, to do so.'" (Reply at 5-6 (quoting *U.S. ex rel. Health Dimensions Rehab., Inc. v. RehabCare Grp., Inc.*, Civ No. 4:12-00848 AGF, 2013 WL

251, 264 (1946).) Relators also contend that because "Defendants left no paper trail as to exactly who performed what on whom in the [Wellness Center] during the Phase II period . . . they bear the risk of uncertainty which their own wrongs have created and Relators are entitled to present Essling's estimates as reasonably based on the available relevant evidence."[17] (*Id.* at 8.)

Finally, Relators argue that Defendant's objection to Essling's methodology is an improper attempt to limit damages recoverable under the False Claims Act for Defendant's alleged false claims. (*Id.* at 10.) Relators assert that "[t]he False Claims Act does not entitle Defendants to retain a portion of their fraudulently obtained payment." (*Id.* (citing 31 U.S.C. § 3729(a)(1)).) Relators contend that "[t]he only reason Medicare agreed to pay Defendants anything with respect to the patients at issue is because a physician certified that the patient needed specified prescribed services in order to improve or maintain the patient's condition, and Defendants, in connection with their assessments, certified to Medicare the amount of skilled services the patient needed." (*Id.* at 10.) Relators assert that "when Defendants did not provide those prescribed services, or did not provide them in accordance with Medicare's standards, then, by

---

5340910, at *2 (E.D. Mo. Sept. 23, 2013.) Here, the Court finds that Essling's estimates are reasonably based on the available relevant evidence. To the extent Defendant's disagree with Essling's methodology, they may address their concerns during cross-examination. *Bonner*, 259 F.3d at 929-30

[17] Relators also contend that while Essling provided alternative damages calculations during Phase I which he has not provided for Phase II, "the fact that he did not undertake those laborious and inappropriate methodologies advocated by Defendants [] does not affect the relevance or reliability of his methodology." (Rel. Opp. at 6 n.2.)

12

definition, Defendants were not providing the services that had been determined the patient needed to meet Medicare's goals," and the government did not get the services it bargained for. (*Id.* at 10-11.) Accordingly, Relators argue that the entire payment for that patient during the period when the prescribed services were not being provided constitutes the damage the government sustained.[18] (*Id.* at 11.)

The Court rejects Defendants' argument that Essling's testimony is fundamentally unsupported and resolves any doubts regarding the overall value of Essling's testimony in favor of its admissibility. *See Clark by Clark v. Hendrick*, 150 F.3d 912, 915 (8th Cir. 1998) (noting that "doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility"). The Court finds that there is sufficient evidence in the record to support his Essling's findings, rendering them neither speculative nor irrelevant.

The Court also declines to exclude Essling's testimony based on his methodology. While it is correct that Relators have the burden to make a reasonable estimate with respect to damages, the Court finds that Essling's estimates are just and reasonable based

---

[18] Defendants contend that damages would be the full amount the government paid only if a plaintiff could prove the government obtained no value whatsoever. (Doc. No. 507 ("Reply") at 10.) Here, Defendants argue that "Relators readily concede [ ] that patients received valuable skilled therapy services and do not dispute that patients received nursing services, social services, and room and board that was needed for their effective care. (*Id.* at 10-11.) Defendants contend that "under a straightforward application of the benefit-of-the-bargain theory, the purported lack of value the government received could easily be addressed by eliminating all therapy minutes in the Wellness [Center] and readjudicating the patient[']s Medicare claim after those allegedly improper minutes are subtracted from the claim." (*Id.* at 14.) Defendants therefore argue that Essling's methodology is at "odds with black letter law," "frivolous," and "fairyland." (*Id.* at 14-15.)

on available relevant evidence, and that they sufficiently reflect a benefit-of-the-bargain theory of damages.[19]  *Bigelow v. RKO Pictures,* 327 U.S. at 264.  The Court also finds that whether or not Essling performed alternative damage calculations during Phase I has no impact on the relevance or reliability of his Phase II methodology.[20]  Moreover, the Court finds that the factual basis of his opinion goes to the credibility of the testimony, not its admissibility.  *Bonner*, 259 F.3d at 929.  To the extent Defendants dispute Essling's methodology, they may address their concerns during cross examination.

  2. **Bovee**

Bovee has over 20 years of experience working in the long-term care industry as an occupational therapist, director of rehabilitation therapy, a Medicare appeals coordinator, and a Medicare compliance consultant.  (Doc. No. 287 ¶ 3, Ex. 1 ("Bovee Initial Rep.") at 2-5.)  She currently serves as the Vice President of Clinical Strategies at HealthPRO/Heritage, one of the largest independently owned diversified therapy and

---

[19]   The Court agrees with Relators that if Defendants did not provide prescribed services, or did not provide them in accordance with Medicare's standards, then Defendants did not provide the services necessary to meet Medicare's goals, and the government did not get the services it bargained for.  While Defendants contend that the purported lack of value the government received could have been be addressed by eliminating all therapy minutes in the Wellness Center and readjudicating the patients' Medicare claims after those allegedly improper minutes were subtracted from the claims, the Court finds that this oversimplifies the issue.  If patients had received the therapy minutes they were allegedly deprived of, there is no way of knowing how long they would have required care, or what other services may have become unnecessary more quickly.  Accordingly, the Court finds that Essling's calculations are reasonably based on the available relevant evidence.

[20]   The record reflects that Essling's Phase II methodology is one of several methodologies he applied during Phase I.  (*See* Doc. No. 285-2 ¶¶ 6, 11,  Ex. B.)

related services providers in the country.[21] (Connors Decl. ¶ 6, Ex. 3 ("Bovee Supp. Rep.") at 1.) In her initial expert report, Bovee described the landscape of Medicare, the specific Medicare requirements for the provisions of skilled therapy in skilled nursing facilities, and how Defendants violated those requirements.[22] (Bovee Initial Rep. at 5-7.) In a supplement to her report, Bovee asserts that she reviewed the applicable Medicare requirements for the Phase II period, and that the opinions she expressed as to Phase I also apply to Phase II. (Bovee Supp. Rep. at 2-3.) Defendants move to exclude Bovee's testimony on the grounds that it is irrelevant to the issues in Phase II, and that it is speculative and unreliable. (Def. Memo. at 5-9, 11-13.)

Defendants first contend that while Bovee reviewed medical records for ten patients, "she does not express an opinion with respect to any of the patients . . . and does not conclude that any allegedly false claims were submitted during Phase II." (*Id.* at 6.) Defendants also assert that Bovee "testified at length that the ten patients benefited from therapeutic exercise, which was necessary given their severe functional and health deficits." (*Id.* at 5-6 (citing Conners Decl. ¶ 7, Ex. 4 at 24, 1, 39, 54, 79, 81, 87)).

---

[21] As Vice President of Clinical Strategies, Bovee provides in-services and training to rehab and facility clinical staff, and assists with the development and implementation of a wide range of evidence based clinical programs to ensure quality and continuity of care, effective operational implementation and measurable clinical outcomes. (Bovee Supp. Rep. at 1.) She also serves as a resource for clinical programs, caseload development, clinical strategies, education and training, and works to promote the growth and development of clinical programs and processes. (*Id.*)

[22] Bovee's initial report expressed opinions with respect to Phase I. (Bovee Initial Report.)

15

Defendants argue that because Bovee's opinions do not relate to the issues in Phase II, they are irrelevant and will not help the trier of fact. (*Id.* (citing Fed. R. Evid. 702(a); *Daubert*, 509 U.S. at 591; *United States v. $141,770 in U.S. Currency*, 157 F. 3d 600, 605-06 (8th Cir. 1998); *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1150-53 (D. Minn. 2011); *In re Viagra Prods. Liab. Litig.*, 572 F. Supp. 2d 1071, 1086 (D. Minn. 2008)).)

Defendants argue further that Bovee's testimony should be excluded because her opinions are speculative and inadmissible. (Def. Memo. at 7.) Specifically, Defendants contend that her reasoning was not properly applied to the facts at issue because there is no evidence in the record to support her assumption that the activities in the Wellness Center during Phase II were consistent with what occurred during Phase I.[23] (*Id.* at 11-12.)

Relators argue that Bovee's testimony is both relevant and factually supported by the record. (Rel. Opp. at 2-5.) Relators first contend that Bovee's testimony about the Medicare requirements for the provision of therapy in nursing homes during the Phase II

---

[23] In her supplemental report, Bovee states that she "has been informed" that the activities in the Wellness Center during Phase II were consistent with what occurred during Phase I. (Bovee Supp. Rep. at 3.) Defendants contend that the only support Relators have for their Phase I claims is the testimony of Relator Johnson. (Def. Memo. at 12.) They argue further that because Johnson did not work in the Wellness Center during the Phase II period, and because other "undisputed" evidence from Phase I depositions "directly contradicts" each of Relators' allegations, Bovee's opinion should be excluded because it is based on an inaccurate assumption contrary to the facts of the case. (*Id.* at 12-13.) As discussed in its Order denying Defendants' motion for summary judgment and incorporated here by reference, the Court finds this argument unpersuasive. (*See* SJ Order.)

16

period is as relevant to the issues in Phase II as her testimony about those requirements during the Phase I period was to the issues in Phase I.  (*Id.* at 2-3.)  Relators also assert that "the fact that the condition of certain patients may have improved during their stay at Hillcrest does not mean that improvement was attributable to their visits to the [Wellness Center], as opposed to, for example, the therapy they were receiving in the therapy gym." (*Id.*at 3.)  Even if the improvement could be attributed to visits to the Wellness Center, Relators argue that it would not be relevant to whether Defendants submitted claims for therapy provided by those who were not supervised or not licensed to provide it, or whether the alleged therapy was in actuality an unskilled service.  (*Id.*)  Finally, Relators argue that Bovee need not testify as the ultimate issue that Defendants submitted false claims in order for her testimony to be relevant and of assistance to the jury.  (*Id.* at 3-4.)

Regarding Defendant's argument that Bovee's testimony is speculative, Relators point out that the Court rejected a similar argument with respect to Phase I.  (*Id.* at 4-5 (citing Phase I Order at 43-43).)  Relators also dispute the alleged contradictory evidence Defendants rely on, but assert that even there is such evidence, "the existence of contradictory evidence does not justify exclusion of expert opinion."  (*Id.* (citing *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002).)

The Court finds that Bovee's opinions and testimony are neither irrelevant nor unreliable.  Specifically, the court finds that Bovee's testimony about the Medicare requirements for the provision of therapy in nursing homes during the Phase II period is no less relevant to the issues in Phase II as her related testimony with respect to Phase I.  Moreover, the Court finds ample factual basis to support Bovee's assumption that the

17

activities in the Wellness Center during Phase II were consistent with what occurred during Phase I. The Court is further unpersuaded that Bovee's testimony is irrelevant because the conditions of some patients improved during their stay at the Hillcrest facility. In short, the Court finds no reason to exclude Bovee's opinions and testimony with respect to Phase II. Notwithstanding, Bovee's testimony shall be subject to the same limitations set forth in the Court's Phase I Order such that her testimony may not encroach upon the role of the factfinder or offer as-applied opinions. (*See* Phase I Order at 43-44.)

## CONCLUSION

For the reasons stated above, the Court declines to strike the Essling Report because it was both timely disclosed and Defendants suffered no prejudice. Moreover, the Court finds no reason to exclude the expert testimony of Essling or Bovee.

## ORDER

Accordingly, based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Strike Mark Essling's Expert Report (Doc. No. [466]) is **DENIED**. Notwithstanding, the Court declines to award attorneys' fees or costs to Relators; and,

2. Defendants' Motion to Exclude Expert Testimony of Mark Essling and Elisa Bovee (Doc. No. [483]) is **DENIED**.

Dated: April 22, 2020      s/Donovan W. Frank
                           DONOVAN W. FRANK
                           United States District Judge